IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SPORTSCASTR INC., (d/b/a PANDA INTERACTIVE), | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO.  2:23-CV-00472-JRG |
| SPORTRADAR GROUP, AG, and SPORTRADAR AG, | § § § | |
| *Defendants.* | § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Sportradar Group AG ("Sportradar Group") and Sportradar AG's ("Sportradar AG") (collectively, the "Defendants") Motion to Dismiss, and, in the Alternative, to Transfer (the "Motion"). (Dkt. No. 27.) In their Motion, Defendants move this Court to dismiss Plaintiff Sportcastr, Inc.'s (d/b/a PANDA Interactive) ("PANDA") Amended Complaint under Federal Rule of Civil Procedure 12(b)(2), or, in the alternative, to transfer to the District of Delaware under 28 U.S.C. § 1404(a). Having considered the Motion, the subsequent briefing, and for the reasons stated herein, the Court is of the opinion that the Motion should be **DENIED**.

## I.    BACKGROUND

On October 5, 2023, Plaintiff PANDA filed this patent infringement lawsuit against Sportradar Group, a global sports technology and entertainment company publicly traded on the NASDAQ Stock Exchange. (Dkt. No. 1 ¶¶ 17, 18; Dkt. No. 35-10 at 1; Dkt. No. 35-11 at 1.) PANDA's business involves providing multiple video streaming products, including a video streaming platform for betting operators and sports media along with a Sportscastr mobile app for individual sports fans.  (Dkt. No. 1 ¶ 21.)  PANDA alleged that Sportradar Group, a direct competitor with headquarters and its principal place of business in St. Gallen, Switzerland,

infringes on PANDA's patented technologies by providing video streaming software and systems without authorization to customers in Texas and within this District, including to networks, broadcasters, and U.S. professional sports leagues with franchises and activities in Texas.  (*Id.* at ¶¶ 17, 23, 28, 29, 32, 35.)  Specifically, PANDA alleges that the infringing video streaming products include, but are not limited to, Sportradar emBET, Sportradar OTT, and Sportradar Live Channel Trading (LCT) (collectively, the "Accused Products").  (*Id.* at ¶ 17.)

In response to the original Complaint, Sportradar Group filed its first motion to dismiss for lack of jurisdiction and, in the alternative, to transfer on February 9, 2024.  (Dkt. No. 11.)  Along with its motion, Sportradar Group submitted a declaration stating that its primary operating subsidiary, Sportradar AG, was the "entity responsible for the creation, development, maintenance, and servicing of the accused emBET, OTT, and Live Channel Trading (LCT) products." (Dkt. No. 11-1 at ¶ 32.)  That motion to dismiss became moot when PANDA filed its Amended Complaint on March 8, 2024, adding Sportradar AG as a defendant.  (Dkt. No. 17 ¶ 24; Dkt. No. 36 at 2.)  Like its parent company, Sportradar AG is a Swiss company with its headquarters and principal place of business in St. Gallen, Switzerland.  (Dkt. No. 27 at 3.)  In its Amended Complaint, PANDA alleged that Sportradar AG was the "entity responsible for the creation, development, maintenance, and servicing of the accused emBET, OTT, and Live Channel Trading (LCT) products" used by Defendants' customers in the United States, the State of Texas, and within this District.  (Dkt. No. 17 at ¶¶ 28, 35, 36, 37.)

On April 15, 2024, Defendants filed the present Motion on the grounds that this Court lacked personal jurisdiction or, alternatively, that Delaware is a more convenient forum. (Dkt. No. 27.)

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss Under Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant.  FED. R. CIV. P. 12(b)(2); *Prep Sols. Ltd. v. Techono Ltd.,* No. 2:23-CV-00211-JRG, 2024 WL 1744065, at *2 (E.D. Tex. Apr. 22, 2024).  In patent cases, personal jurisdiction intimately relates to patent law, and Federal Circuit law governs the issue.  *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1016 (Fed. Cir. 2009).

If the parties have not conducted jurisdictional discovery, a plaintiff need only make a *prima facie* showing that the defendant is subject to personal jurisdiction, and the pleadings and affidavits are to be construed in the light most favorable to the plaintiff.  *Id.* (quoting *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008)).  In addition to the requirement that the district court "must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor," the court also draws all reasonable inferences in the plaintiff's favor.  *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995, 999 (Fed. Cir. 2018); *Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1338 (Fed. Cir. 2006).

Personal jurisdiction exists over a defendant where "the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019).  Due to Texas's long-arm statute being "coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge."  *Id.*  Due process is satisfied when a court finds that a defendant has "minimum contacts" with the forum state such that exercising personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *See Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).

3

Courts may have jurisdiction over a defendant pursuant to either general or specific jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  To exercise specific personal jurisdiction, the Court must determine: "(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is reasonable and fair."  *SnapPower v. Lighting Def. Grp.*, 100 F.4th 1371, 1374 (Fed. Cir. 2024) (quotation marks cleaned up).  The first two factors comprise the "minimum contacts" portion of the jurisdictional framework.  *Id.* at 1374–75.  Where the first two factors are satisfied, specific jurisdiction is "presumptively reasonable."  *Id.* at 1375.  The burden then shifts to the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable jurisdiction unreasonable."  *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

**B.      Motion to Transfer Pursuant to § 1404(a)**

In evaluating a motion to transfer pursuant to § 1404(a), the Court considers the Fifth Circuit's list of private and public interest factors. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*").  The private interest factors include: (1) "the relative ease of access to sources of proof"; (2) "the availability of compulsory process to secure the attendance of witnesses"; (3) "the cost of attendance for willing witnesses"; and (4) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.*  The public interest factors include: (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having localized interests decided at home"; (3) "the familiarity of the forum with the law that will govern the case"; and (4) "the avoidance of unnecessary problems of conflict of laws." *Id.*

To support a claim for transfer under § 1404(a), a movant must demonstrate that the transferee venue is "clearly more convenient" than the current District.  *Id.*  This elevated burden reflects the weight owed to the plaintiff's choice of forum.  *In re Vistaprint Ltd.*, 628 F.3d 1342, 1344 (Fed. Cir. 2010).

III.  **DISCUSSION**

Defendants move this Court to dismiss this case for lack of personal jurisdiction or, in the alternative, transfer to the District of Delaware.  The Court addresses each request in turn.

A.  **Defendants' Motion to Dismiss Pursuant to Rule 12(b)(2)**

In their Motion, Defendants ask this Court to dismiss for lack of personal jurisdiction under Rule 12(b)(2), arguing that PANDA "fail[s] to allege sufficient facts to support a *prima facie* showing of personal jurisdiction" and "cannot establish the requisite 'minimum contacts' with the State of Texas to support personal jurisdiction."  (Dkt. No. 27 at 1.)  Specifically, Defendants contend that Defendant has not "undertaken any activities in, or directed any activities at, Texas, let alone in the Eastern District of Texas."  (*Id.*)

In its Response, PANDA makes several arguments that the Court has personal jurisdiction. (Dkt. No. 35 at 3.)  In its primary argument, PANDA asserts that "jurisdiction is appropriate over each of the Defendants because both have intentionally directed their conduct toward and purposefully availed themselves of the State of Texas."  (*Id.* at 4.)  Additionally, PANDA argues that jurisdiction against each Defendant is proper under theories of agency, alter ego, and indirect infringement.  (*Id.* at 4, 19.)

Since PANDA does not argue that this Court possesses general jurisdiction over Defendants, the Court focuses on specific personal jurisdiction.  Ultimately, the Court finds that PANDA makes a *prima facie* showing that Sportradar Group and Sportradar AG are subject to personal jurisdiction because (1) PANDA has sufficiently alleged minimum contacts by

Defendants purposefully directed at the forum state, (2) there is a nexus between the Defendants' contacts and PANDA's claims, and (3) Defendants have not put forth a compelling case that the exercise of jurisdiction over the defendant is unfair or unreasonable.  *See ESPOT, Inc.*, 492 F. Supp. 3d at 688.

### 1.    The Court finds that PANDA has sufficiently alleged minimum contacts by Defendants purposefully directed at the forum state.

"Minimum contacts . . . are established by 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State.'"  *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp*., 395 F.3d 1315, 1321 (Fed. Cir. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Defendants argue that PANDA cannot establish that either Defendant "purposefully directed any activities at the residents" of Texas because "Sportradar Group does not 'deliver' any products or services . . . into any U.S. stream of commerce" and Sportradar AG "does not offer for sale or license the Accused Products in Texas."  (Dkt. No. 27 at 6, 11.)

In response, PANDA argues that the Defendants directly infringe the Asserted patents by making, using, offering to sell, and selling the Accused Products, in Texas and this District, and by purposefully directing its activities at the forum.  (Dkt. No. 35 at 5-7.)  PANDA alleges that the Defendants' activities include directly partnering with media and sports leagues that broadcast in the Texas, lobbying in Texas to expand access to their Accused Products, placing their Accused Products in the stream of commerce, and seeking to employ individuals in Texas. (Dkt. No. 35 at 5-7; Dkt. No. 17 at ¶ 28, 33-41.)  In support, PANDA begins by asserting that the Defendants' declarant, Mr. McGarry, made two statements confirming PANDA's allegations against Sportradar AG.  (Dkt. No. 35 at 5.)

The first of Defendants' statements that PANDA argues support the Court's exercise of personal jurisdiction over Sportradar AG is the statement that "Sportradar US works with Sportradar AG . . . to market, offer to sell, and sell the accused OTT product and market and offer to sell the accused emBET Product."[1]  (Dkt. No. 35 at 5; Dkt. No. 11-1 at ¶ 14.)  PANDA argues that this statement, and the corresponding allegations in the First Amended Complaint, support the reasonable inference that Sportradar AG directly infringes the Asserted Patents by offering to sell and selling the Accused Products in Texas and in this District.  (Dkt. No. 35 at 5.)

The second of Defendants' statements that PANDA argues supports the Court's exercise of personal jurisdiction is the statement that "Sportradar AG is the entity responsible for the creation, development, maintenance, and servicing of the accused emBET, OTT, and Live Channel Trading (LCT) products."  (Dkt. No. 27-1 at ¶ 33.)  PANDA argues that Sportradar AG "makes" or "uses" the Accused Products in Texas and in this District when Sportradar AG "maintains" and "services" the Accused Products.  (Dkt. No. 27-1 at ¶ 33; Dkt. No. 35 at 5-6.)

In response, Defendants do not dispute that the Accused Products are offered for sale in the United States; rather, Defendants argue that PANDA "has not provided any evidence that [the Accused Products] are sold or used *in Texas*."  (Dkt. No. 36 at 4.)  (emphasis original).

PANDA counters with numerous allegations of the Defendants' contacts with Texas and this District.  As an example, PANDA cites an announcement in its Sur-Reply[2] stating that Sportradar Group "launched emBET (an Accused Product) in NBA's League Pass," which is

---

[1] The Plaintiff notes that Defendants removed this statement from its amended declaration, likely because Defendants "realized that this admission was fatal to their motion after PANDA cited them in the [First Amended Complaint]." (Dkt. No. 35 at 5.)  Defendants do not argue that the Court should not consider the statements in the initial declaration; rather, the Defendants argue that this statement does not allege evidence of "sales 'in Texas.'"  (Dkt. No. 36 at 4.)

[2] PANDA's Sur-Reply and its attachments show that PANDA could present additional information that would support its claims.  Rather than striking portions of the Sur-Reply, requiring Plaintiff to amend its Complaint to include additional information, and requiring the Parties to restart this briefing process, the Court will simply consider the arguments and attachments presented in the Sur-Reply.  *See Ultravision Techs., LLC v. Govision, LLC*, No. 2:18-CV-100-JRG-RSP, 2020 WL 1158606, at *7 n.2 (E.D. Tex. Mar. 9, 2020).

"offered for sale '*in every state*,' including Texas." (Dkt. No. 39 at 1; 39-2; 39-3.) (emphasis original).  PANDA argues that this announcement shows that Sportradar Group offers an Accused Product for sale in Texas.  (Dkt. No. 39 at 5-6.)   Likewise, this announcement together with Defendants' statement that Sportradar AG is "the entity responsible for the creation, development, maintenance, and servicing of the accused emBET" provide a reasonable inference that Defendant Sportradar AG makes and uses the Accused Product in Texas. (Dkt. No. 27-1 at ¶ 33.)

PANDA also contends that Defendants intentionally direct their conduct toward and purposefully avail themselves of the State of Texas by directing and controlling operations of the U.S. subsidiaries, directly partnering with organizations that operate in Texas, and advertising these partnerships.  (Dkt. No. 35 at 5-6.)  In its Amended Complaint, for example, PANDA alleges that Sportradar AG has "entered into data partnerships with . . . sports leagues [that] have many franchises located in, and host events in, the state of Texas" and "has entered into streaming and broadcast agreements with multiple networks and broadcasters who broadcast sports media in the State of Texas and within [the Eastern District]." (Dkt. No. 17 at ¶¶ 35, 38).[3]  PANDA specifically asserts that the Defendants' customers include a number of U.S. professional sports leagues with activities and franchises in Texas, including the National Basketball Association, the National Football League, the National Hockey League, the Extreme Football League,[4] Major League

---

[3] Plaintiff PANDA rightly contends that these "'sports federations, news media, consumer platforms and sports betting operators' are not just Sportradar Groups AG's partners—they are its customers."  (Dkt. No. 35 at 6.)

[4] While the Defendants assert that they never "licensed or provided the accused OTT, emBET, or LCT services" to the NFL, SEC, and XFL, one of PANDA's exhibits provides evidence that Sportradar entered into to a sports data and content agreement with the XFL where "Sportradar will offer a play-by-play data feed specifically designed for media usage, including websites, apps and digital platforms like fantasy sports," that will give XFL's fans "access and opportunities to engage with [XFL's] games, teams, and players."  (Dkt. No. 36 at 5; Dkt. No. 36-4 at ¶ 4; Dkt. No. 35-8 at 1-2.)  This exhibit further states that "Sportradar's official data partnerships with US leagues" include "the NFL."  (Dkt. No. 35-8 at 2.)  Considering the conflicting nature of these exhibits, the fact that the Accused Products are not limited solely to emBET, OTT, or LCT services, and the requirement that the Court must "resolve any factual conflicts in the affidavits in the plaintiff's favor," the Court gives these allegations their due weight. *M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995, 999 (Fed. Cir. 2018).

Baseball, the Southeastern Conference, and NASCAR.  (Dkt. No. 17 ¶ 35.)  These sports leagues include Texas-based organizations such as the Dallas Cowboys, Texas Rangers, Dallas Stars, Houston Texans, Houston Astros, San Antonio Spurs, the Dallas Mavericks, University of Texas Longhorns, Texas A&M Aggies, FC Dallas, and the Extreme Football League.  (Dkt. No. 35 at 6-7, 9; Dkt. No. 35-8 at 1-2.)  Furthermore, PANDA alleges that FC Dallas and the Extreme Football League, for example, have headquarters in Frisco, Texas and Arlington, Texas, respectively.  (Dkt. No. 17 ¶ 39; Dkt. No. 35 at 9.)

Defendants do not dispute that these organizations operate or have headquarters in Texas or this District.  Instead, Defendants argue that "many of those contracts" are signed by its U.S. subsidiaries,[5] not Sportradar Group or Sportradar AG. (Dkt. No. 27-1 ¶ 24; Dkt. No. 27 at 15.) The Defendants, however, then admit that "Sportradar AG engages in contracts with certain sport organizations."  (Dkt. No. 36 at 5.)  Even if Defendants argue that "many of those contracts" are signed by its U.S. subsidiaries, the Court must accept PANDA's uncontroverted allegation at this stage that "some of these agreements" are attributable to Sportradar Group and Sportradar AG. (Dkt. No. 35 at 9; *see also M-I Drilling Fluids UK Ltd*., 890 F.3d at 999 ("[A] district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor.").

---

[5] While Defendants argue that PANDA "strategically failed" to name two of its U.S. subsidiaries, the Court agrees with PANDA that Defendants offer no authority to support this argument.  (Dkt. No. 27 at 16; Dkt. No. 35 at 21-22.) Furthermore, the Court is not persuaded by Defendants that their U.S. subsidiaries are indispensable and necessary parties when the parent company, Sportradar Group, is already a named party in the action.  *See In re Taasera Licensing LLC, Pat. Litig.*, No. 2:22-CV-00303-JRG, 2023 WL 2716548, at *4 (E.D. Tex. Mar. 29, 2023) ("Trend Micro U.S. is neither desirable nor necessary when its upstream parent company, Trend Micro Japan, that makes the accused products is already a named party in the EDTX Action.").  This is particularly true when the Defendants have admitted that the parent company, Sportradar Group, "operates the business and controls strategic decisions and day-to-day operations," including the operations of Sportradar AG, which is "responsible for the creation, development, maintenance, and servicing of the accused . . . products" being used in Texas and within this District. (Dkt. No. 35-4 at F-10; Dkt. No. 27-1 ¶ 33; Dkt. 17 at ¶ 34-35.)

PANDA also argues that Defendants place their Accused Products in the "stream of commerce" with the knowledge and intention that they would be used in Texas and in this District. (Dkt. No. 35 at 10-12; Dkt. No. 17 at ¶ 34, 36.).  Specifically, PANDA alleges that the "Accused Products are used in Texas and purchased and used by Texas residents . . . who travel to [Arkansas and Louisiana] to place sports bets."  (*Id.*; Dkt. No. 35 at 10.).  PANDA argues that it is a "reasonable inference . . . that Texas residents travel to and from Texas to place legal sports bet[s] in neighboring states ***taking the Accused Products with them***." (Dkt. No. 35 at 11) (emphasis original).  Furthermore, PANDA argues that because Sportradar has partnered with FanDuel to supply it with official NBA data and supplementary betting services, and because the NBA has three professional sports league teams in Texas, it "takes little conjecture to infer that among the 2 million sports bets placed in Texas each year, at least some involve 'industry leader' Sportradar." (Dkt. No. 35 at 12.)

Defendants argue that PANDA's stream of commerce theory is "fatally flawed" because PANDA "fails to identify who use the allegedly infringing systems, how they are purportedly available in the jurisdiction, or provide any other requisite detail."  (Dkt. No. 27 at 13.)

The Court notes that under the "stream of commerce" theory, the forum State "does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980).  The Court looks to whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297.  The Court also notes that the unresolved plurality decision of *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102 (1987) is deemed nonbinding by the Federal

Circuit, which instead applies its precedent from *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994). *See AFTG–TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1362–66 (Fed. Cir. 2012) (discussing the plurality *Asahi* decision and its effect on Federal Circuit precedent). Consequently, the Federal Circuit's approach is to determine whether the minimum contacts are established under both theories, making the choice between theories unnecessary. *AFTG-TG*, 689 F.3d at 1364.

Here, the Court finds that it is a reasonable inference that the Defendants have placed their Accused Products in the stream of commerce with the expectation that the Accused Products would be used in Texas. Several press releases name "Sportradar Group," not its U.S. subsidiaries, as "the trusted partner" of "more than 1,600 customers in over 120 countries," including news media, consumer platforms, sports betting operators, and sports federations such as the ATP, NBA, WNBA, NHL, MBL, NASCAR, UEFA, FIFA, and Bundesliga. (Dkt. No. 35-5 at 2; Dkt. No. 35-12; Dkt. No. 35-15.) Furthermore, these press releases proclaim that Sportradar Group is the entity that "covers close to a million events annually across all major sports." (Dkt. No. 35-5 at 2; Dkt. No. 35-12; Dkt. No. 35-15.) Defendants not only partner with these large organizations, but they also intentionally partner with major sports leagues that have franchises, events, operations, and fans located in one of the biggest states in the United States: Texas. Defendants' partnerships with major sport leagues like the NBA, the NFL, the NHL, the MLB, and the SEC include Texas-based organizations such as the Dallas Cowboys, Texas Rangers, Dallas Stars, Dallas Mavericks, Houston Texans, Houston Astros, San Antonio Spurs, University of Texas Longhorns, and Texas A&M Aggies. (Dkt. No. 35 at 6-7, 9; Dkt. No. 35-8 at 1-2.)

Moreover, no evidence exists showing that Defendants opted to limit the availability of its Accused Produces to exclude Texas or to change the functionality of its Accused Products to

operate in a different (*e.g.*, non-infringing) way in Texas.  (Dkt. No. 39 at 5.)  In fact, PANDA cites an announcement stating that Sportradar Group "launched emBET (an Accused Product) in NBA's League Pass," which is "offered for sale '***in every state***,' including Texas." (Dkt. No. 39 at 1; 39-2; 39-3.)  With over two million sports bets placed each year in Texas, totaling nearly $9 billion, and the fact that Texas (and this District) borders Louisiana and Arkansas—i.e., two states that have legalized gambling—the Court agrees with PANDA that "at the very least . . . Defendants intentionally directed the Accused Products toward the State of Texas."  (Dkt. No. 35 at 12; Dkt. No. 17 at ¶¶ 36-37.)

In addition to the allegations discussed above, PANDA alleges that Defendants have recruited, hired, and lobbied to make gambling legal in Texas.  (Dkt. No. 35 at 8-9, 12-13; Dkt. No. 17 at ¶¶ 33.)  Specifically, PANDA alleges that Sportradar Group "has recruited Texas residents at the highest levels of the company," including hiring "Gerard Griffin as its Chief Financial Officer," who "Defendants do not dispute that Sportradar Group AG hired" and was "based in Austin, Texas at the time he was hired; spent his entire tenure working for Sportradar Group AG in Austin, Texas; and is ***still*** based in Austin, Texas today." (Dkt. No. 35 at 12-13; Dkt. No. 39 at 4) (emphasis original).

The Court, therefore, finds that Defendants have placed their Accused Products in the stream of commerce under both Justice Brennan's and Justice O'Connor's articulation of the stream of commerce theory.  *See Asahi*, 480 U.S. at 112 ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in

the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.").

Consequently, the Court finds that PANDA has alleged minimum contacts by both Sportradar Group and Sportradar AG to sufficiently show that the Defendants intentionally directed toward and purposefully availed themselves of the State of Texas and this District.

As additional arguments, PANDA asserts that jurisdiction is proper under theories of agency, alter ego, and based on Defendants' acts of indirect infringement. (Dkt. No. 35 at 13, 19.) In support, PANDA cites Sportradar Group's Annual Report to investors as well as to the allegations discussed above. (Dkt. No. 35 at 13-19.)  In Sportradar Group's Annual Report, for example, Sportradar Group announced that it "operates the business and controls strategic decisions and day-to-day operations," including that of its primary operating entity, Sportradar AG, which is responsible for maintaining and servicing the Accused Products. (Dkt. No. 35 at 6; *see also* Dkt. No. 35-4 at F-10.)  However, since the Court finds that PANDA has alleged sufficient minimum contacts by the Defendants intentionally directing and purposefully availing themselves of the forum state, the Court need not address the agency, alter ego, or indirect infringement theories for personal jurisdiction.

### 2. The Court finds that PANDA's claims arise from and relate to Defendants' contacts in Texas.

The Court finds that PANDA's claims of infringement arise from or relate to Defendants' contacts with Texas.  In its Amended Complaint, PANDA alleges that its patent infringement claims arise out "Defendants provid[ing], and continu[ing] to provide, the Accused Products and services using the Accused Products that practice the systems and methods claimed in the Asserted Patents in the State of Texas and within this District."  (Dkt. No. 17 ¶ 34.)  Specifically, the Court finds that PANDA's cause of action for patent infringement arises out of the Defendants' streaming

and broadcast agreements with networks and broadcasters who broadcast sports media in Texas and within this District, along with the partnerships with U.S. sports leagues and teams that have events, franchises, or headquarters in Texas and in this District.  (Dkt. No. 17 at ¶¶ 34-41.)

### 3.    The Court finds that Defendants have not made a "compelling case" that the assertion of jurisdiction is unfair or unreasonable.

The third prong of the specific personal jurisdiction inquiry is whether the exercise of jurisdiction over the defendant is fair and reasonable.  *ESPOT, Inc.*, 492 F. Supp. 3d at 688 (citing *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012)).  If the plaintiff establishes the first two prongs, the burden shifts to the defendant to make a "compelling case" that the assertion of jurisdiction is not fair or reasonable.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  Other than general opposition to the Court's exercise of personal jurisdiction, Defendants present no argument that the exercise of jurisdiction would be unfair, unjust, or unreasonable.  Defendants fail to present a compelling case that the Court's exercise of jurisdiction would not be fair or reasonable.

As a result, the Court concludes that it may properly exercise specific personal jurisdiction over Sportradar Group and Sportradar AG.  Since the Texas long-arm statute is coextensive with federal due process, the Court need only look to the federal due process inquiry.  PANDA has established a *prima facie* case for personal jurisdiction under the constitutional due process test by pleading Sportradar Group and Sportradar AG have minimum contacts with the forum state such that jurisdiction will not offend the traditional notions of fair play and substantial justice.  (Dkt. No. 17 at ¶ 34.)  Accordingly, the Court finds that it has personal jurisdiction over both Sportradar Group and Sportradar AG in this case.

**B.      Jurisdictional discovery is not necessary.**

PANDA requests that if the Court "still has questions about whether jurisdiction is proper" that the Court hold this Motion in abeyance until the parties can conduct jurisdictional discovery. (Dkt. No. 35 at 20.)  The Court, however, finds that jurisdictional discovery is unnecessary in light of the above discussion.

**C.      Defendants' first-filed case argument fails.**

Defendants argue that this case should be dismissed or transferred to Delaware under the first-filed case rule.  (Dkt. No. 27 at 17-18.)  Under this rule, a district court may choose to "stay, transfer, or dismiss a duplicative later-filed action, although there are exceptions and the rule is not rigidly or mechanically applied—an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012) (quotation marks cleaned up).

Here, PANDA filed its original Complaint on October 5, 2023.  (Dkt. 1.)  Nevertheless, Defendants contend that its declaratory judgment action in Delaware, which it filed approximately four months later on February 8, 2024, was the first-filed case because "the first case filed by parties over whom the court had jurisdiction is properly considered the first-filed case." (Dkt. No. 27 at 17; Dkt. No. 36 at 8.)

In response, PANDA argues that the Court need not address Defendants' first-filed argument because it is premised on the Court being unable to exercise discretion over at least one defendant.  (Dkt. No. 35 at 22.)  PANDA also contends that personal jurisdiction is not a factor in the first-filed analysis and cites, in support, to a "near identical fact pattern in another case from this District." (*Id.*)  In that case, the Texas action was unquestionably filed before the declaratory judgment action in the District of Delaware.  *In re Seattle SpinCo, Inc.*, 817 F. App'x 987, 988 (Fed. Cir. 2020).  The issue arose, however, when the district court dismissed the sole defendant

15

from the suit while, in the same order, granting leave for the plaintiff to file an amended complaint, which would add five subsidiaries of the dismissed defendant.  *Id.*  The defendant filed a motion to transfer, arguing that the Delaware action was the first-filed case because "it was the first court to obtain personal jurisdiction over the parties."  *Id.* On review, the Federal Circuit denied the petitioner's request for mandamus and declined to adopt a rule where first-filed status is determined by which court obtains personal jurisdiction over the parties first.  *Id.* at 989. Ultimately, the Court finds that Defendants first-filed case argument fails. *Merial Ltd.*, 681 F.3d at 1299 (noting that the first-file case rule is "not rigidly or mechanically applied," rather "an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts.").

### D.      Motion to Transfer to a Clearly More Convenient Forum

Having found that this Court can properly exercise personal jurisdiction over the Defendants, the Court considers Defendants' motion to transfer this action to the District of Delaware based on convenience.  (Dkt. No. 27 at 20.)  Prior to examining the private and public interest factors, a threshold inquiry is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed."  *Volkswagen I*, 371 F.3d at 203.   PANDA does not dispute that the Complaint could have been filed in the District of Delaware.  (*See* Dkt. No. 11.)  Accordingly, the Court finds that this threshold question is satisfied. It turns next to the question of convenience.

### 1.      The Private Interest Factors

Defendants argue that the "relative ease of access to sources of proof" factor weighs in favor of transfer because its non-party U.S. subsidiaries are incorporated in Delaware and have operations in Minnesota, Nevada, and New York.  (Dkt. No. 27 at 21; Dkt. No. 27-1.)  In response,

PANDA argues that its own principal place of business is in Las Vegas, Nevada.  (Dkt. No. 35 at 27.)  Together, two of the four operations are located in Las Vegas, which is over 1,000 miles closer to Texas than it is to Delaware.  (*Id.*)  Likewise, the Minnesota location is nearly 200 miles closer to Texas than it is to Delaware.  (*Id.*)  Nonetheless, neither party asserts that any physical documents or evidence exist in either district, lessening the weight of this factor in the transfer analysis.  *See In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 630 (5th Cir. 2022) (recognizing that electronic evidence is equally accessible in different forums and holding that "[t]he location of evidence bears much more strongly on the transfer analysis when, as in *Volkswagen*, the evidence is physical in nature") (*citing Volkswagen II*, 545 F.3d at 316–17).  Thus, this factor is neutral.

Next, the Court finds that the "availability of compulsory process to secure the attendance of witnesses" factor is also neutral in the transfer analysis.  Both parties agree that this factor is likely to be neutral and Defendants have neither shown nor alleged that any non-party witnesses would be unwilling to testify in this case.  The Court agrees with the parties and finds that this factor is neutral in the transfer analysis.

With respect to the "cost of attendance of willing witnesses" factor, Defendants argue that it weighs in favor of transfer because two of PANDA's inventors are located in New York and some of its employees from its U.S. subsidiaries are located in Minneapolis or New York.  (Dkt. No. 36 at 10; Dkt. No. 36-2 at 1-2.)  Defendants acknowledge, however, that PANDA's other two inventors are "similarly close" to this Court as to the District of Delaware because they are located in Chicago and Las Vegas, respectively.  (Dkt. No. 36 at 10; Dkt. No. 36-2 at 1-2.)  In response, PANDA argues that this factor weighs against transfer because its corporate headquarters is in Las Vegas—where Defendant acknowledges at least one of PANDA's inventors is located—which is

over 1,000 miles closer to this Court.  (Dkt. No. 35 at 28.)  Defendants also contend that if any of its European employees are needed to testify, they are also closer to Delaware than to this District.  (*Id.*)  The Federal Circuit, however, has given little to no weight to the travel inconvenience of witnesses traveling from overseas, as such "will be traveling a great distance no matter which venue the case is tried in."  *See e.g., In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009).  The Court also notes that neither party has identified specific witnesses who will testify at trial.  Nonetheless, the Court finds that this factor weighs slightly in favor of transfer.

The fourth private interest factor addresses concerns rationale based on judicial economy.  *Quest NetTech Corp. v. Apple, Inc.*, No. 2:19-cv-00118, 2019 WL 6344267, at *6 (E.D. Tex. Nov. 27, 2019); *see also In re Vistaprint Ltd.*, 628 F.3d at 1346.  Under this factor, the Court may consider any judicial economy benefits which would have been apparent at the time the suit was filed, including the co-pendency of cases involving the same patent. *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013).   Defendants claim that this factor is neutral despite there being a separate case currently before the Court: *SportsCastr Inc. v. Genius Sports Ltd*., Case No. 2:23-cv-00471-JRG.  (Dkt. No. 27 at 22.)  While Defendants acknowledge that the separate case "involves three of the same patents," Defendants argue that the Court should find this factor is neutral because it "involves different accused products," "no commonality between Defendants or the technology accused," and the fact that the "Court has not yet developed any experience with the Accused Patents."  (Dkt. No. 27 at 22-23.)  In response, PANDA argues that this factor weighs heavily against transfer because many important issues are common across both cases, including claim construction.  (Dkt. No. 35 at 28.)  PANDA further argues that transferring this case to Delaware would at least double the amount of judicial resources the federal judicial system must expend construing the Asserted Patents—not to mention the likelihood that this Court and the

Delaware court may yield inconsistent results.  (*Id.*)  The Court agrees with PANDA and finds that the fourth factor weighs against transfer.

### 2.     The Public Interest Factors

The first public interest factor concerns the speedy and efficient administration of justice. Defendants argue that this factor weighs slightly in favor of transfer because "there are 821 pending cases in the Eastern District of Texas per authorized judgeship versus 559 pending cases per authorized judgeship in the District of Delaware."  (Dkt. No. 27 at 23.)  In response, PANDA notes—and Defendants do not dispute—that "the median time to trial in patent cases is over 15 months shorter in this Court (630 days) than in the Delaware court (1,095 days)."  (Dkt. No. 35 at 28.)  In other words, there is no dispute that this Court is trying patent cases at twice the rate as the Delaware Court where Defendants seeks to transfer this case.  While this Court recognizes that the Federal Circuit has instructed that this factor should not weigh against transfer when the plaintiff "is not engaged in product competition in the marketplace," the Court notes that PANDA has alleged that it is a direct competitor of Defendants.  *In re Google LLC*, 58 F.4th 1379, 1383 (Fed. Cir. 2023).  Further, the Court is persuaded that the transfer of this case would only serve to increase, not lessen, court congestion.   There is no dispute that the *Genius Sports Ltd.* case will remain pending before this Court and the practical effect of transferring this case while retaining the *Genius Sports Ltd.* case would be to duplicate many proceedings, including the claim construction of the three similar patents.  It is axiomatic that such a result would necessarily increase court congestion—not just for the present litigants but for the public at large. As such, the Court finds that this factor weighs against transfer.

The second public interest factor considers "the local interest in having localized interests decided at home."  *Volkswagen II*, 545 F.3d at 315.  Defendants argue that "Delaware is the

incorporated home of both the Plaintiff and two of the relevant 'Sportradar' subsidiaries."  (Dkt. No. 27 at 23.)  As an initial matter, the Court takes note that the two U.S. subsidiaries are not parties to this action.  Even if the U.S. subsidiaries were parties, the Court looks not to "the parties' significant connections to each forum . . . but rather the significant connections between a particular venue and the events that gave rise to a suit."  *In re TikTok, Inc.*, 85 F.4th 352, 364 (5th Cir. 2023).  The rationale for the Court not considering the parties' connections to the venue is because the "local interest analysis is a public interest factor."  *In re Clarke*, 94 F.4th 502, 511 (5th Cir. 2024).  Without more evidence that one forum has a greater connection to the events giving rise to this suit, the Court finds that this factor is neutral.

Both parties agree that the final factors involving the familiarity of the forum with the governing law and the conflicts of law are neutral.  The Court sees no reason to overturn the parties' agreement.  These factors, therefore, are neutral.

### 3.    Defendants have not established the District of Delaware is clearly more convenient.

Having found that five of the eight factors are neutral, one weighs slightly in favor of transfer, and two weigh against transfer, the Court concludes that the District of Delaware is not a "clearly more convenient" forum for this dispute.  Consequently, the Court is of the opinion that Defendant's Motion to Transfer (Dkt. No. 27) should be denied.

## IV.    CONCLUSION

For the reasons stated herein, the Court finds that Defendants' Motion (Dkt. No. 27) should be and hereby is **DENIED** in all respects.

**So ORDERED and SIGNED this 17th day of September, 2024.**


RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE