```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   SPORTSCASTR, INC.,            (  CAUSE NO. 2:23-CV-472-JRG
                                   )
 4             Plaintiff,          (
                                   )
 5   vs.                           (
                                   )
 6   SPORTRADER, INC., et al.,     (  MARSHALL, TEXAS
                                   )  MAY 9, 2025
 7             Defendants.         )  10:00 A.M.
     _____

 8

 9

10   _____

11                        MARKMAN HEARING

12

                BEFORE THE HONORABLE RODNEY GILSTRAP
13              UNITED STATES CHIEF DISTRICT JUDGE

14   _____

15

16

17

18

19

20

21

22              SHAWN McROBERTS, RMR, CRR
                  100 E. HOUSTON STREET
23              MARSHALL, TEXAS  75670
                    (903) 923-8546
24        shawn_mcroberts@txed.uscourts.gov

25
```

<u>A P P E A R A N C E S</u>

FOR THE PLAINTIFFS:   KING & SPALDING, LLP
                      500 W. 2ND STREET, SUITE 1800
                      AUSTIN, TEXAS  78701
                      (512) 457-2000
                      BY: MR. MATTHEW WOOD

                      CAHILL GORDON & REINDEL, LLP
                      1990 K STREET, N.W., SUITE 950
                      WASHINGTON, DC 20006
                      (202) 862-8932
                      BY:  MR. BRITTON DAVIS
                           MR. CHRISTOPHER CAMPBELL

                      KING & SPALDING
                      1700 PENNSYLVANIA AVENUE, NW
                      SUITE 2ND FLOOR
                      WASHINGTON, DC 20006
                      (202) 737-0500
                      BY:  MR. PATRICK LAFFERTY

                      KING & SPALDING
                      1185 AVENUE OF THE AMERICAS
                      34TH FLOOR
                      NEW YORK, NEW YORK  10036
                      (212) 556-2100
                      BY:  MR. RAHUL SARKAR

                      STECKLER WAYNE CHERRY &
                      LOVE, PLLC
                      107 EAST MAIN STREET
                      HENDERSON, TEXAS  75653
                      (903) 212-4444
                      BY:  MR. GREGORY LOVE

FOR THE DEFENDANTS:   BRYAN CAVE LEIGHTON
                      PAISNER, LLP - ST. LOUIS
                      ONE METROPOLITAN SQUARE
                      211 NORTH BROADWAY, SUITE 3600
                      ST LOUIS, MISSOURI  63102-2750
                      (314) 259-2000
                      BY:  MR. DAVID ROODMAN
                           MR. NICK WILLIAMSON
                           MR. GEORGE BRELL

```
 1                                    KIRKLAND & ELLIS, LLP
                                      401 CONGRESS AVENUE
 2                                    AUSTIN, TEXAS  78701
                                      (512) 678-9100
 3                                    BY:  MS. JEANNIE HEFFERNAN

 4                                    KIRKLAND & ELLIS, LLP
                                      1301 PENNSYLVANIA AVE. NW
 5                                    WASHINGTON, DC 20004
                                      (202) 389-5160
 6                                    BY:  MR. PATRICK ARNETT
                                           MR. SOCRATES BOUTSIKARIS
 7
                                      SCHEEF & STONE, LLP - MARSHALL
 8                                    P.O. Box 1556
                                      MARSHALL, TEXAS  75671-1556
 9                                    (903) 938-8900
                                      BY:  MR. MICHAEL SMITH
10
             OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
11                                    100 E. HOUSTON STREET
                                      MARSHALL, TEXAS  75670
12                                    (903) 923-8546

13

14

15

16

17

18

19

20

21

22

23

24

25
```

09:54:29

|  |  |
|---|---|
| | 1 |
| 10:04:25 | 2 |
| 10:04:30 | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:05:00 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 10:05:28 | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1    THE COURT:  Be seated, please.

2     All right.  This is the time set for claim construction

3  in two consolidated cases.  The matters before the Court today

4  relate to SportsCastr, Inc., versus Sportrader Group, et al.,

5  which is lead Case No. 2:23-CV-472, as well as SportsCastr,

6  Inc., versus Genius Supports, Ltd., et al., Member Case No.

7  2:23-CV-471.

8     Let's begin with announcements on the record from the

9  parties.

10     What says SportsCastr, Plaintiff in both matters?

11    MR. LOVE:  Your Honor, Greg Love for the Plaintiff.

12  And with me today are Matt Wood, Rahul Sarkar, Brit Davis,

13  Chris Campbell, and Patrick Lafferty.

14    MR. LAFFERTY:  Good morning, Your Honor.

15    MR. LOVE:  And also in the gallery is Brian

16  Uttermoser.  And we're ready to proceed.

17    THE COURT:  All right.  Thank you.

18     What's the announcements from Sportradar?

19    MR. SMITH:  For Sportrader, Your Honor, Michael

20  Smith, and joining me is Mr. Dave Roodman, Mr. Nick

21  Williamson, Mr. George Brell.  And we're ready to proceed.

22    THE COURT:  All right.  Thank you.

23     What's the announcement for Genius Supports?

24    MS. HEFFERNAN:  Good morning, Your Honor.  Jeannie

25  Heffernan on behalf of the Genius Sports Defendants.  Along

10:05:53   1    with mr are Patrick Arnett and Socrates Boutsikaris.  We're

           2    ready to proceed.

           3            THE COURT:  All right.  Thank you.

           4        I'll say, counsel, I'm cognizant of and appreciative for

           5    the recent narrowing that's taken place here.  I was concerned

           6    about the breadth of the disputed terms earlier in the

           7    process, but it looks like we are down to a workable number

10:06:27   8    today, and I am thankful for that.

           9        Let's start with -- and I'll try to follow the order that

          10    you've suggested in your email traffic with the Court.  Let's

          11    start with the term 'event socket' and any argument related to

          12    'socket of a socket server'.  I know there's some dispute

          13    about what's appropriate here, but I see no reason not to hear

10:06:56  14    whatever the arguments you have on these terms.

          15        It appears that the real question at the root of the

          16    matter is whether the event socket must be dedicated to a

          17    particular event.  Defendants say it must and Plaintiffs say

          18    it need not be.  Both have proposed specific constructions.

          19        Let he hear from the Plaintiff first on this, please,

10:07:22  20    then I'll hear Defendants' argument.

          21            MR. DAVIS:  Good morning, Your Honor.  Britton Davis

          22    with Cahill Gordon for Plaintiff --

          23            THE COURT:  Good morning.

          24            MR. DAVIS:  -- SportsCastr.

          25            THE COURT:  Please proceed.

1          MR. DAVIS:  Thank you, Your Honor.

2          'Event socket' is a coined term, it's not a term of art,

3      and so in that instance, of course, claim constructions could

4      be helpful for the jury.  However, as we've prepared for

5      argument, the claims do provide sufficient context, we think,

10:07:56   6      so that a construction is probably not necessary if the Court

7      decides to go in that direction.

8          That said, we have proposed a construction, and that is

9      'a socket through which event information can be sent in a

10     synchronized manner to multiple client devices'.

11         And Your Honor did zero in on the key dispute as to

12     whether or not the socket must be dedicated to a particular

13     event.

14             THE COURT:  Yeah.  You say 'can', and I'm sure the

10:08:25   15     Defendants object to the latitude that 'can, but doesn't have

16     to be'.

17             MR. DAVIS:  That's right.  So 'dedicated', even if

18     the Court were to go with 'dedicated'--which we don't think is

19     appropriate; it's not in the claims, it's been imported from

20     certain specification embodiments into the claims in their

21     construction--'dedicated' doesn't mean only one.  Right?

22     'Dedicated' -- you could be dedicated to your family, your

23     church, your career.  Right?  You could be dedicated to

10:08:56   24     multiple things.  What it means is in this context if it's

25     imported into the spec is that you're available -- that socket

1    is available for communication regarding an event.  You could

2    have more than one event.  And we'll discuss how you can have

3    more than one event through a socket, and that's through event

4    information channels, which the specification specifically

5    discusses as having more than one channel per socket.

10:09:29    6        So Defendants' proposed construction also has a few other

7    issues.  They try and jam three different claim terms into a

8    single construction, and those constructions all have

9    different words but they want to read them in the same way.

10    And there's well-settled Federal Circuit case law that

11    different words in a claim have different meaning.  Just as

12    one instance, 'event socket of the at least one socket

10:09:58    13    server', which is the second proposed term -- the term they're

14    proposing as construction, Defendants' proposal leaves out

15    'server' entirely.  There's no mention of a server.  And the

16    server is important.  That's the structure that provides for

17    the socket.  Right?  So right there we think there's an easy

18    problem with their construction.  Right?  It ignores claim

19    terms.  That's inappropriate.

10:10:26    20        The other issue is we're not entirely sure what they're

21    doing with 'socket of a socket server' based on the joint

22    claim construction statement.  We think they're proposing this

23    'socket dedicated to a particular event construction', but

24    they also have a socket server construction which they're

25    arguing which in the joint claim construction chart was 'a

1    server in which a socket is dedicated to a single event'.  So

2    we're not exactly sure where they're going with that

3    construction.

4          THE COURT:  Well, it's my intention to give you

10:10:59   5    another turn after we hear from Defendants.

6          MR. DAVIS:  Excellent.  Thank you, Your Honor.

7      So to start off, Defendants have filed IPRs in this case.

8    I think you're aware of that.  A number of them have been

9    instituted.  And the Defendants' IPR construction is different

10    than the one they're proposing for Your Honor.  Now, I know

11    Defendants are saying they're consistent, but there's a lot of

12    different words in there; and I think you could interpret them

13    consistently, but you could also drive a truck through the

10:11:29  14    difference if you wanted to.  Creative lawyering could easily

15    come up with a vastly different meaning for each of those.  So

16    we think right there they're taking inconsistent positions in

17    front of different forums, and we don't think that's

18    appropriate.

19      We don't think either of the IPR construction or the

20    district court construction is appropriate, but they're not

21    saying the same thing in different forums and we don't think

22    that's appropriate.

10:11:56  23      Now, as I mentioned, to start, as we've gone through this

24    process, we think that the claims sufficiently provide

25    guidance as to what 'event socket' means.  And an example on

1    slide 7 is from the '218 Patent claim 1, and we've provided

2    some of the relevant language, and it's a -- the first event

3    socket, event -- the first event socket provides a first event

10:12:26    4    information internet communication channel between a client

5    device.  Right?  It's an endpoint of a communication.  And the

6    claim discusses exactly what's required of the event socket.

7    Right?  It provides an endpoint for the first information

8    internet communication channel.

9         Now, if you import Defendants' claim construction into

10    this claim language, it also conflicts with the claim language

10:12:59    11    and renders words superfluous.  Right?  That's not -- that's

12    disfavored in claim construction.  We've provided a

13    replacement for Your Honor in slide 7 where 'event socket' --

14    the second use of 'event socket' is replaced with Defendants'

15    construction of 'a socket dedicated to a particular event'.

16         Well, the claim already says the first event socket

17    corresponds to the first event information germane to the

10:13:28    18    sporting event.  That's highlighted at the bottom there.

19    Right?  We don't need 'dedicated to a particular event' in the

20    claims.  And, in fact, 'dedicated' and 'correspond' are

21    different words with different scopes.  So what their claim

22    construction does is it conflicts with the language of the

23    claim and also renders other language superfluous.  That's

24    disfavored under Federal Circuit law.

25         The other thing Defendants' construction -- or one of the

10:13:55    1    other things that Defendants' construction does is it reads

2    out specifications disclosed in the specification -- the

3    embodiments disclosed in the specification.  And Defendants

4    concede that the specification discloses an embodiment where

5    an event socket, one event socket has multiple or at least two

6    event information channels within it.

7         Now, they say, Okay, that's fine, we're going to ignore

8    that because the specification's exemplary embodiments all

10:14:30    9    have the channels from a single event socket from a single

10    event, but there's nothing in the patent that requires that.

11    Just because on slide 9 if a single embodiment is disclosed in

12    the specification, that doesn't mean that the claims are so

13    limited unless there's a clear intention in the spec to limit

14    it in that way.  And that's, you know, black letter law from

10:14:58    15    the *Liebel Flarsheim* case, 358 F.3d 898.

16         THE COURT:  Well, clear intent seems to smack of

17    lexicography, and I don't see either side arguing lexicography

18    with this term.

19         MR. DAVIS:  That is correct, Your Honor.  And, in

20    fact, we believe that the Defendants have acknowledged there's

21    no express disavowal or express lexicography with regard to

22    the claim.

23         On slide 11, we've got a clip from Defendants' response

10:15:27    24    brief, and they say, Indeed, even absent any statements of

25    explicit disavowal or words of manifest exclusion, which would

1  be the lexicography statements, they're saying, well, we used

2  it a bunch in a particular way in the patent.  Right?  And

3  it's got to be repeated, consistent, exclusive.  Well, as we

4  will show you, Your Honor, there's no repeated, consistent, or

5  exclusive use of this in the claims--right?--or in the

6  specification.

10:15:57   7  So on slide 10, PANDA submitted an expert declaration

8  from Dr. Shamos, and he looked at the claims and said -- and

9  that's Docket 149-1 at paragraph 118.  He said there's nothing

10  within the specification or the claims that forecloses an

11  event socket from being dedicated to more than one event, for

12  example, via two separate event information channels dedicated

10:16:26   13  to two separate events.  This is unrebutted.  They have

14  attorney argument trying to explain what a POSITA would think

15  the patents mean, but they have no expert testimony on this

16  point.

17  THE COURT:  Let me ask you a question.  In the

18  patent owner's preliminary response that was filed with the

19  PTAB on behalf of your client--and this is at I believe it's

10:16:56   20  pages 63 and 64--it talks about explaining that the patented

21  technologies employ a socket server that transmits the event

22  information associated with the particular event back to the

23  viewers.

24  Now, it doesn't say only a particular event, but it

25  doesn't say multiple events either.  And it may be somewhat

10:17:27

1    agnostic on this point, but yet at the same time if you simply

2    just read, it's talking about supplementing information to a

3    livestreamed event and there's nothing there to indicate that

4    it would go beyond a single event.  It certainly doesn't say

5    it has to be a single event, but it sure doesn't talk about

6    anything more than a single event.

7        How persuasive -- again, we're not in the realm of

8    lexicography, but how persuasive should that kind of material

10:18:00

9    be to the Court here?

10            MR. DAVIS:  So the discussions in IPR briefing I

11    think are part of the record certainly, but we're not

12    describing every possible embodiment, and there's no doubt

13    that the specification talks about a -- one or two exemplary

14    embodiments.  Right?  And the specification is incredibly

10:18:28

15    permissive saying that they're all exemplary.

16        So on slide 13 we have multiple examples of where the

17    spec says, "According to one inventive implementation"--

18    Right?--or "in one example," or "in some implementations."

19    Right?  So the patent does talk about the example where you

20    have a socket that transmits information over event

10:19:00

21    information channels with a single event, but they're

22    expressly exemplary discussions.  And we have expert testimony

23    that says there's nothing to prevent multiple events to be

24    provided from a single socket through different event

25    information channels.

10:19:27

1    So, you know -- and I don't believe we disputed the

2    construction in the IPRs.  I think we just said, Look, even

3    your construction in the IPRs, you can't meet it.  Right?

4    We're not going to fight you on it in the IPRs; we don't

5    necessarily agree with that construction, but you haven't been

6    able to show it.  Right?  And that's our point in that regard.

7            THE COURT:  All right.  Let's go back to the spec

8    for a minute.

9            MR. DAVIS:  Uh-huh.

10           THE COURT:  You talked about your belief that the

11   Defendants are reading out embodiments.  I do agree that

10:19:57

12   there's not an embodiment in the specification dedicated to

13   more than one event.  And if there is no embodiment laid out

14   in the spec describing one of the ways in which this invention

15   could work that's dedicated to more than a single event, how

16   should I weigh that in determining this key issue about

17   whether or not 'event socket' is dedicated to a particular

18   event or not dedicated?

10:20:28

19           MR. DAVIS:  So in the first instance --

20           THE COURT:  Let me say it another way.  I think it

21   would be stronger for your side if there was an embodiment in

22   the spec that talked about more than one event, but I don't

23   see it there.  Have I missed it, or if I haven't missed it,

24   what's the import of that?

25           MR. DAVIS:  Okay.  So you haven't missed it.  The --

1    there are embodiments that don't say that the event socket is

2    dedicated--right?--to anything that discuss the information

10:20:58    3    channels being dedicated.

4        So, for example, '218 Patent, column 27, lines 1 through

5    7 on slide 12, the patent discusses the various inventive

6    implementations, and it's providing information to broadcaster

7    clients and viewer client devices via a socket-based event

8    information channel that's dedicated to the event.  Right?  So

10:21:28    9    it's not saying the socket is dedicated there.  And at

10    '218 Patent, 23:38 through 52 it's talking about event sockets

11    without mentioning they are being dedicated.

12        Now, even if Your Honor was to find 'dedicated', we don't

13    believe 'dedicated' means just one event through the -- is

14    allowed to go through the socket.  And we have expert

15    testimony that says the spec is not so limited.  Right?

10:21:58    16    Expressly read the spec, a person of ordinary skill could

17    easily implement, based on the disclosure, multiple events.

18        But the exemplary embodiments described in the

19    specification do discuss one event being provided through the

20    event socket.  But we don't believe -- so the case law is even

21    where a single embodiment is disclosed, it's not sufficient to

10:22:29    22    read it restrictively into the claims unless there's a clear

23    intent to limit the claims in that way.

24        And the clear discussion of exemplary embodiments in the

25    specification and the fact that a POSITA could easily

10:23:00

1    implement multiple sporting events through a particular socket

2    using the disclosed event information channels, there is no

3    clear intention to limit the claims to only one event through

4    one event socket.

5         THE COURT:  All right.  What else, Mr. Davis, on

6    this term?

7         MR. DAVIS:  On this term -- so we think PANDA's

8    construction -- or SportsCastr's construction complies with

9    all the various embodiments, so that's why we've proposed it.

10   It comes out of the spec--not verbatim, but close to it--at

10:23:25

11   the '218 Patent, column 26, lines 37 through 67.

12        And then we have expert testimony confirming it again at

13   Shamos' declaration paragraph 119.

14        The one thing I do want to touch on, and so those

15   constructions -- that argument really touches all three of the

16   sort of terms that Defendants are trying to mush together, but

17   'socket of a socket server' I think deserves a little

18   additional attention, because that's one of the other terms

19   they're trying to jam in there.

20        And 'socket' now has an agreed construction.  Right?

10:23:58

21   It's plain and ordinary meaning, which is 'an endpoint for

22   network communications'.  That's the joint claim construction

23   chart at 8.  And 'server' is a well-understood term.  It's a

24   computer.  Right?

25        And, in fact, some of the confusion comes from the joint

1    claim construction chart where Defendants no longer contend

2    'socket server' requires a separate construction, if the

3    Court's going to hear argument on 'socket of a socket server'.

10:24:27    4    So I'm not sure if this is a contingent argument based on

5    whether Your Honor's going to construe it or not, but 'socket

6    of a socket server' does not need construction.  'Socket' is

7    agreed, it's plain and ordinary meaning, and 'server' is a

8    computer.  Right?  It's a computer that provides network

9    communication.  So 'socket of a socket server' is a socket on

10    a computer that provides sockets.  Right?  It's

11    self-explanatory and circular.  It needs no construction.

10:24:58    12    THE COURT:  Let me say this.  There has been some

13    back and forth about whether certain things have been properly

14    raised and properly briefed, and just for the benefit of

15    everyone present, I'll worry about those niceties later.  I

16    want to hear all the arguments on everything so that I'm fully

17    equipped to deal with whatever might need to be construed

18    after you-all have left today.

19    MR. DAVIS:  Understood, Your Honor.

20    THE COURT:  So I'm happy to hear on 'socket of a

21    socket server' from you on this.

10:25:27    22    MR. DAVIS:  Well, the argument is simple.  The

23    claims provide whatever context is required, and the claims

24    of the various patents deal with 'event socket' and 'socket'

25    separately.  They reference them separately.  For example,

1    claim 19 of the '697 Patent says, "at least one first event

2    socket of the at least one socket server." Right? It's using

3    'event socket' in the claims, then it describes what's

4    happening with it.

5        Claim 1 of the '088 Patent, on the other hand, says "just

10:25:58    6    a first socket of a socket server." Right? And then it

7    describes what's required of that.

8        And under Federal Circuit case law, we must presume that

9    the words -- different words in the claim terms are given

10    different meanings. Right? And that's *Cae Screenplates,* 224

11    F.3d 1308 at 1317 Federal Circuit.

12        That's pretty basic claim construction law. Different

13    words are supposed to have different meanings, and they're

10:26:28    14    conflating those two terms we think with no adequate

15    justification.

16            THE COURT: All right.

17            MR. DAVIS: Also, we don't think that the

18    specification limits every socket of a socket server to 'event

19    sockets'. Right? There's no statement in the specification

20    that says every socket we discuss of a socket server has to be

21    an event socket. We haven't found that. If it's there we

22    haven't seen Defendants argue it. You know, the specs are

23    long, so it's possible I missed it, but I haven't seen it,

10:26:59    24    so...

25        And with that, we're on to the next term, Your Honor, so

1    I'll --

2            THE COURT:  All right.  Thank you.

3        Let me hear from Defendants with regard to this

10:27:12    4    particular term.

5            Whenever you're ready, Ms. Heffernan.

6            MS. HEFFERNAN:  Thank you, Your Honor.

7        So I guess I'll just -- I wanted to briefly follow up on

8    something that Mr. Davis discussed with the Court, and that

9    was with respect to PANDA's slide 12.  And I'll just --

10:27:58    10        Actually may I switch to the document camera?

11        So on this slide Mr. Davis was saying that the

12    embodiments do not require event sockets to be dedicated to a

13    single event and used this quote from the '218 Patent as an

14    example of where you have an event information channel that's

15    dedicated to the event but not the socket.

10:28:27    16        And I just wanted to go to the next part of that patent.

17    So Mr. Davis' slide ended at line 7.  And let's go to the

18    Defendants' table.  Great.

19        So if we look at -- picking up here, "Thus, all viewers

20    and broadcasters of the event, regardless of which livestream

21    they may be generating or watching, connect to one or more

10:28:57    22    sockets of a socket server that is/are dedicated to the

23    event."

24        All throughout the specifications of all four

25    patents--and they're all consistent, they're virtually

identical--the specifications always talk about a socket or an event socket of a socket server that is dedicated to the event.  And that makes sense, because the whole point of the invention is this novel socket architecture -- socket server architecture that serves only sockets that are dedicated to a particular event.  And let me just kind of explain why that's so.

So let's go to our slides, and let's go to slide 8, I think it is.  This is the -- that was the correct slide.

This is the problem that the patents were trying to solve and this is how they were doing it.  The problem is you've got all of these viewers of an event who, in the prior art, you had a viewer who was dedicated to a unique one and only socket but you had multiple viewers of the same event, and so you were not getting low latency synchronized transmissions of event information to all of the viewers of the event.

And so the solution, the alleged solution, the novelty in the patents was to say, Okay, we're actually going to take one socket and dedicate that socket to multiple users but for the same event.  And by doing that, you could ensure that the user experience across multiple users for the same event is synchronized; they are all getting the same information at the same time.  And it's that architecture, that socket server architecture, that the patentee said was inventive.

THE COURT:  That raises a question in my mind,

counsel.  It seems like Plaintiffs' counsel got up to, perhaps

didn't quite cross the line, but seemed to imply to me that if

your proposed construction seemed appropriate to the Court,

then the Court would in all likelihood need to go one step

10:31:30    further and construe what 'dedicated' means.

Is there any doubt in your mind within the scope of what

you proposed that 'dedicated' is something that might need to

be looked at as far as its impact and scope?  I mean, the last

thing I want is to go through this process today, and then

down the road when it's the least inconvenient one or both

10:31:58    sides tell me, Well, you know, we have to now know what

'dedicated' means and we didn't ask you back at claim

construction months ago.

MS. HEFFERNAN:  Right.  It may be that that is

something that the Court should construe at this point, yes,

because -- and I think the --

THE COURT:  I'm always sensitive to the *02 Micro*

landmines.

MS. HEFFERNAN:  Yes.  And I think that this whole

process has certainly served the goal of the Court to provide

10:32:30    notice to the public of what is claimed and what the metes and

bounds are of the claims.  And I think the briefings process

has helped elucidate that.  'Dedicated to a particular event',

maybe -- the 'dedicated' part may be something that the Court

needs to construe in light of the Plaintiff's argument that

1   you could have -- you could be dedicated to more than one

2   thing.

3        But Plaintiffs' argument was in the abstract--you know,

4   you can be dedicated to your parents and your church.

10:32:58    5   Certainly.  Here we're talking about something different, and

6   we're talking about an architecture, and that architecture

7   shows a one-to-one dedication, meaning the architecture is one

8   to many, one socket to many viewer client devices, but it is

9   one-to-one in terms of the event, and that was the whole point

10   of the invention.

11        So let's go to the next slide.

12        THE COURT:  Well, I think your proposal of

13   'particular event' covers the 'one event' part of it.

10:33:28    14        MS. HEFFERNAN:  It does.  And actually, Your Honor,

15   as we were preparing for this hearing, 'particular' can have

16   different meanings in different contexts, but in this patent

17   -- these patents, 'particular' means 'single' --

18        THE COURT:  All right.

19        MS. HEFFERNAN:  -- just to be crystal clear about

20   that.

21        So if the Plaintiffs' view were correct and that you

22   could be dedicated to multiple -- a single event socket could

10:33:59    23   be dedicated to multiple events, it would not only frustrate

24   the purpose of the invention--which is to ensure that all

25   viewers of the same event get event information at the same

1    time and that's achieved by being dedicated to only one

2    event--it would lead to absurd results.

3        So let's go to the next slide.

4        THE COURT:  Well, in that vein, the specification,

10:34:27    5    as I think I talked about with your opposing counsel, doesn't

6    offer an embodiment where there is a dedication to more than a

7    single event; but by the same token, it doesn't in any way

8    foreclose expressly the possibility that there could be an

9    event socket dedicated to more than one event.

10        MS. HEFFERNAN:  It does not expressly foreclose

11    that, Your Honor, but it does implicitly foreclose that

12    because it is -- the inventive concept is the novel socket

10:35:00    13    server architecture in which a socket or an event socket of

14    the socket server is dedicated to a particular or single

15    event.

16        THE COURT:  So, in essence, you're telling me that

17    because the embodiments in the specification are embodiments

18    dedicated to a single event, that implicitly excludes the

19    dedication of a socket -- an event socket to more than one

10:35:29    20    event.  Is that right?

21        MS. HEFFERNAN:  That is what I'm arguing, yes.

22        THE COURT:  Okay.  Then I understand what you're

23    arguing.

24        MS. HEFFERNAN:  And I think we know that that is

25    true based on -- here we've got on slide 10 how Plaintiffs'

1    view of 'dedicated' would result in an absurdity and would

2    totally undermine the point and the inventive concept of the

3    invention.

4        So here you've got -- I mean, if one event socket could

10:35:59  5    be dedicated to more than one event it could be dedicated to

6    an unlimited number of events.  And what we're showing here on

7    slide 10 is you've got, you know, the first three events--you

8    know, football, baseball, basketball--through infinity, and

9    you would have this single event socket and the socket server

10    serving all of the viewers of all of those events at the same

11    time.  And that is not what is described as being the

10:36:29  12    invention.  In fact, that's the exact opposite of the

13    invention.  And then you would be back into the prior art

14    world where they say -- the Plaintiff says you have massive

15    latency issues and you couldn't ensure that multiple viewers

16    of the same event were getting the same event information at

17    the same time.

18        So let's go to the next slide.

19        And, in fact, all the claims recite that each event

10:36:56  20    socket or socket of a socket server, they don't recite that

21    it's dedicated.  I agree that 'dedicated', that language is

22    not in the claims, but the specification consistently,

23    repeatedly, and exclusively discusses the socket server

24    architecture as serving sockets or event sockets that are

25    dedicated to a particular or a single event.

10:37:29   1    And that is confirmed by the claim language where you

       2    always see first event information being sent to a first event

       3    socket of the at least one socket server, and then you have --

       4    later you have a second -- you have a second event information

       5    being sent to a second viewer device.  So it's always

10:37:54   6    one-to-one, meaning one socket to one event or one event

       7    socket to one event; you never see multiple events being

       8    assigned to a single socket.

       9    And let's go to slide -- actually let's go to slide 17.

      10    I'm jumping around a little bit, but I'm trying to do this

      11    expeditiously.

      12    If we look at the '697 Patent specification, all of the

      13    patents share the same specification in virtually every

      14    regard, and certainly in -- as relevant here.

10:38:29  15    If we look at the 697 patent at column 47, lines 3

      16    through 11, this is really a great, concise description of

      17    what I was just discussing.  "Once a change an event status

      18    has been defected, for example, if a play clock updates, the

      19    control server provides these changes to the one or more

      20    sockets dedicated to the event (to which all viewers and

10:38:57  21    broadcasters of video-based commentary regarding the event,

      22    (the event) are communicatively coupled), resulting in a

      23    single synchronized update to all client devices and, thereby,

      24    significantly mitigating client-by-client latency and/or

      25    synchronization issues."  This crystallizes the invention and

1    the architecture -- the allegedly novel architecture that

2    achieves this result.

10:39:30    3        Now, there were some suggestions that --

4        Let's see.  Why don't we go to -- yeah.  Let's go to

5    slide 15, which will illustrate the inventive server

6    architecture.

7        And that inventive server architecture includes the

8    socket server.  And the specification -- again, the '697

10:39:57    9    Patent, but the shared specification, discusses various

10    implementations "wherein the livestream is transmitted to an

11    inventive server and memory storage architecture (additional

12    details of the server and memory storage architecture are

13    shown, for example, in figures 2 and 3)."

14        So figure 2, for example, is an example of the inventive

15    server architecture.  And then when the patent specification

10:40:26    16    goes on to describe figure 2, it says the server -- let me get

17    to the more important part.  "The server further comprises one

18    or more socket servers communitively coupled to the web

19    servers and the control server.  In one aspect the socket

20    servers facilitate communication of synchronized event

21    information relating to a particular event.  In particular,

22    one or more sockets of the socket servers dedicated to the

10:40:59    23    particular event allow respective client devices to establish

24    an event information channel with the socket servers."

25        It's just repeated consistent and exclusive across all

1    three -- all four patents.

2            THE COURT:  All right.  What else?  Do you want to

3    give me your take on 'socket of a socket server'?

4            MS. HEFFERNAN:  Well, the Court has the slides, and

10:41:27  5    I know we're trying to move things along, but I would just --

6    before getting to 'socket of a socket server' just say that

7    PANDA represented to the Patent Office and to this Court that

8    the dedicated socket, that aspect of the invention, is what is

9    novel.  So we have here the statements in the IPRs that

10    "having an event socket dedicated to the event is a

11    significant improvement over the prior art not found in the

10:41:59  12    references cited by Petitioner"--allegedly.  "The '697 Patent

13    solves a technical challenge of providing the same event

14    information in a synchronized manner to all viewers --

15            THE COURT:  Slow down a little --

16            MS. HEFFERNAN:  -- "of such broadcast" --

17            THE COURT:  -- bit if you're goings to read, please.

18            MS. HEFFERNAN:  Okay.  "...via the socket

19    architecture."

20        Because all viewers of the broadcast may receive the same

21    synchronized information via the same event socket, each

22    viewer client device then receives the information in a

10:42:29  23    synchronized manner.  And I think this is helpful because it

24    gets to the question you just posed, Your Honor, which

25    is'socket of a socket server'.  'Socket' is a term of art and

1    it's a well-understood term, and the parties have agreed that

2    it has its plain and ordinary meaning.  But in the context of

3    the novel architecture of the patents, 'socket' is dedicated

10:42:56    4    to a particular event.  How do we know that?  Because of the

5    socket server architecture.

6        So whether you're defining the entire phrase or you're

7    defining 'socket server', the definition, the construction,

8    has to let the jury and the public know that the architecture

9    in which the socket is operating is one in which the server is

10    serving sockets that are dedicated to a particular event.

10:43:28    11    So whether we construe the whole phrase or whether we

12    construe 'socket server' to make it express and clear to a

13    jury that the socket server is a server in which a socket is

14    dedicated to a particular event, I think it could be one or

15    the other approach to that.

16        And maybe the approach is because the parties agree that

17    'event socket' is not a term of art and is something that

10:43:55    18    needs to be construed, that the Court construe 'event socket'

19    and 'socket server', or the Court could construe the entire

20    phrase.  It's really -- I think either way would be

21    appropriate.

22        But the point, though, is to make clear to the jury and

23    to the public that what the patentees claimed was this novel

24    socket architecture in which the socket, event socket, is

25    dedicated to a particular event.

10:44:29    1          THE COURT:  Well, I'll simply say the Court's

2    mindful that its constructions here need to be consistent,

3    and the last thing I want to do is to open a door to something

4    inconsistent between 'event socket' or 'socket of a socket

5    server'.

6          MS. HEFFERNAN:  And they are -- 'event socket' and

7    'socket server' are used interchangeably across all of the

10:44:58    8    patents and throughout the specification.  Even in the '088

9    Patent, which recites "the socket of a socket server" in the

10    claims, that phrase is defined throughout the specification in

11    the same exact way that 'event socket of a socket server' is

12    defined, so I agree with the Court.

13          THE COURT:  It sounds like what you're telling me,

14    Ms. Heffernan, is if you're going to construe 'socket of a

15    socket server', just do it in a way that's consistent with the

10:45:28    16    way we want you to construe 'event socket'.

17          MS. HEFFERNAN:  Yes, because they are the same.

18          THE COURT:  All right.

19          MS. HEFFERNAN:  They are the same.

20          May I quickly see if there's anything else?

21          THE COURT:  Take a moment.

22          MS. HEFFERNAN:  Okay.  Thank you.

23                    (Pause in proceedings.)

24          MS. HEFFERNAN:  Thank you.

25          Which slide is that, Mr. Arnett?

1      I just -- I did want to address one other issue, which is

10:46:00   2   the notion that -- from their expert that a single socket

3   could be dedicated to multiple events.  There is no such

4   disclosure of a socket being dedicated to multiple events in

5   the specifications.  It's always a first --

6          THE COURT:  We've talked about that.  I mean, I

7   asked opposing counsel, Wouldn't you be stronger in your

8   position if there was an embodiment that described a socket

10:46:27   9   -- an event socket being dedicated to more than one event.

10          MS. HEFFERNAN:  So let's go I think to -- yes.

11   Thank you.  Slide 30.

12          PANDA and its expert do point to one example where they

13   say, you know, the information channel is dedicated to the

14   event and not the socket, but I did walk through an example

15   with the Court where the very next sentence showed that the

16   event -- that the socket was dedicated to a particular event.

10:46:59   17   I wanted to continue with that discussion here.  The '218

18   Patent at column 23, lines 52 through 63, which is something

19   that the Plaintiff cited in their opening claim construction

20   brief as an example of one -- where an event socket could be

21   dedicated to more than one event.

22          So in this manner, the first score information would then

23   be transmitted to--and this is why we've highlighted; it's

10:47:29   24   important--both the first viewer client device via the first

25   information internet communication channel, and then there's

1    a discussion of where that event information internet

2    communication channel is located--"between the one or more

3    first event sockets and the first viewer client device."

4        And then you get to the second half of the manner in

5    which first score information is transmitted--"to the second

10:47:58    6    viewer client device via second event information internet

7    communication channel.  Thus, both of the viewer client

8    devices in this scenario would receive the same event score

9    information for the first live sporting event in a

10    synchronized manner from the socket servers."

11        And the last sentence that I read was not included in

12    what PANDA submitted to the Court, and so if you go to that

10:48:26    13    last sentence, it erases any doubt that you still are living

14    in a world where the viewer client devices are receiving the

15    same information for the first live sporting event.  You do --

16    nowhere is there a disclosure where it can be servicing

17    multiple events.  And I think --

18            THE COURT:  That language is clear it's talking

19    about multiple devices, not multiple events.

20            MS. HEFFERNAN:  That's right.  Yes, that's right.

21            THE COURT:  I get your point.

22            MS. HEFFERNAN:  I think that's it.  Thank you, Your

23    Honor.

10:48:58    24            THE COURT:  All right.  Mr. Davis, I'll give you a

25    brief rebuttal if you'd like it.

         1          MR. DAVIS:  I would, Your Honor.  Thank you.

         2          THE COURT:  And the Court is -- I've dedicated a

         3   significant amount of time to this, but I think everybody's

         4   in agreement that this is probably the key dispute today, so

         5   we'll have to move a little quicker when we get past this.

         6      But go ahead.

         7          MR. DAVIS:  Thank you, Your Honor.

         8      So I just wanted to go back to 'dedicated' and what the

10:49:30   9   meaning of 'dedicated' is.

        10      And Your Honor is very perceptive.  If we just go with

        11   'dedicated', which is in the spec a lot--right?--we're going

        12   to be discussing what that means.  And our position is

        13   'dedicated' would be like, you know, a mailbox.  For example,

        14   a mailbox is dedicated to receive my mail; it's also dedicated

        15   to receive my wife's mail and my kids' mail.  Right?  That's

10:49:58  16   -- so that is 'dedicated'--it's a reserved spot where you can

        17   go to get or provide certain information.  But it doesn't mean

        18   only one thing that's reserved for only one person.

        19      Now, opposing counsel said, Well, the system wouldn't

        20   work otherwise.  That's attorney argument.  We have expert

        21   testimony from a person of -- from a POSITA that says actually

        22   it would and it's easy to do it using the disclosed event

10:50:28  23   information channels.  So we heard repeatedly what the purpose

        24   of the invention is, how a POSITA would understand it--that's

        25   all attorney argument; no expert testimony from the other side

1    on this at all.

2        Further, having a socket that was dedicated to only one

3    event for all time wouldn't be a practical or workable system

4    because sockets are a finite resource.  Right?  There's not an

5    *infinitum* number of sockets, and so if you burn a socket for

10:50:59    6    all time on a game you'd run out of sockets.  You'd have to

7    buy another server.  I mean, they have to be available for

8    other games in order to have a system that makes any sense in

9    practical implementation.

10        THE COURT:  I'm not aware of anybody arguing for all

11    time here.

12        MR. DAVIS:  Well, dedicated to a particular event,

13    if you take that to its conclusion, Your Honor --

14        THE COURT:  I mean, if the event goes on forever, I

10:51:26    15    guess the dedication is forever, but most events are finite.

16        MR. DAVIS:  I agree.  But the construction certainly

17    says 'dedicated to a particular event'; not for the time that

18    the event goes on--it's to a particular event.  So I think

19    that the construction suffers from fault in that regard.

20        THE COURT:  All right.

21        MR. DAVIS:  The other thing that Defense counsel

10:51:53    22    said a few times in argument was the structure of how -- this

23    is their slide 10 where you have one channel coming in or one

24    information coming into one socket and then one channel going

25    out to different viewers.  That's not how the system would

10:52:26

1    work.  It would be the channels would go out to all the

2    viewers so they could see any of the events at the same time

3    and it would be -- the information would be synchronized

4    across all of them.  So it's not one goes in and one goes out;

5    it would be the four go in and the four channels go out to all

6    the devices so you could selectively pick which event you want

7    to see in there.

8        So we don't agree with this representation of the

9    technology.  Again, it's attorney argument, so it may not be

10   that important, but it's -- we don't believe that's an

10:52:57

11   accurate technical reflection of the system.

12       Another thing is on slide 13, counsel said something that

13   we agree with, and it's that the claims already cover the

14   system or the implementation that they're worried about.  The

15   claims say it's a first event information channel going to a

16   first event socket about a first or second event.  Right?

17   There's no need to import further limitations into the claims;

18   they already address this.  What they're doing is trying to

10:53:29

19   back-door a negative limitation for something that's not

20   covered in the claims.  The claims already set out what event

21   the information channel is associated with what event and what

22   event socket.  There's no need to do anything further on it.

23       And so that's -- you know, after we were going through

24   this again, Your Honor, that's why we said there's really no

25   need to construe this, even though it's a coined term, because

1    the claims set out in each particular instance what is

2    required.  Right?  It's a first event information going to a

10:53:58    3    first socket about a first event, and a second event

4    information channel going to a second socket about a second

5    event.  The claims do all the work for us already.

6        On slide 17 counsel pointed to the '697 Patent, column

10:54:26    7    22, line 60 to 63, and read the highlighted part "sockets of

8    the socket server dedicated to a particular event," but left

9    out the word right before it--'particular sockets'.  Right?

10    It's not all sockets; it's certain sockets, undefined sockets.

11    Right?  We're not talking about every socket in the device;

12    specifically sockets may be dedicated in that way.

10:54:55    13        Let's see.  And then counsel -- as we acknowledged, the

14    spec discusses a single -- discusses one event per one event

15    socket.  We acknowledge that we don't believe it's limited.

16    We have expert testimony saying it's not so limited and the

17    technology would be simple.  But on their slide 15, the '697

18    Patent, column 2, line 65, through column 3, line 7, the

10:55:28    19    highlighted thing is this is expressly an example.  Right?  It

20    says, "Additional details of the server, memory storage,

21    architecture, as shown, for example, in figures 2 and 3."

22    This is not limiting specification disclosure.  The spec

23    repeatedly says this is a simplified example of the

24    architecture.

25        THE COURT:  What else, Mr. Davis?

10:55:59    1              MR. DAVIS:  One more.  Yeah, this -- so we heard

            2    that, yes, there is disclosure throughout that it's one event

            3    to one socket.  Opposing counsel made the point with slide 30.

            4    Yes, there is one simplified exemplary embodiment disclosed,

            5    but the claims and the specification are not limited to that

            6    one embodiment, Your Honor.

            7              Thank you.

10:56:29    8              THE COURT:  All right.  Thank you.

            9              All right.  Let's go on, counsel, and we'll turn to the

           10    next disputed claim language.  Here we've got a dispute about

           11    whether or not this particular language is or is not

10:56:54   12    indefinite.  The language would be "such that the online

           13    gaming information is shared in a synchronized manner by the

           14    first viewer client device and the second viewer client

           15    device."  And believe we've still got as a live issue the

           16    language from the '088 Patent about "the first digital content

           17    received at the first client device and the second client

10:57:30   18    device is synchronized," et cetera.

           19              Defendants have the burden on indefiniteness by clear and

           20    convincing evidence, so let me hear from the Defendants on

           21    this first.

           22              MR. BOUTSIKARIS:  Good morning, Your Honor.

10:57:56   23    Socrates Boutsikaris from Kirkland & Ellis on behalf of Genius

           24    Sports Defendants.

           25              THE COURT:  Good morning, counsel.  Please go ahead.

```
 1          MR. BOUTSIKARIS:  So I'm going to be arguing the two

 2    'synchronization' terms at issue here.  The first one deals

 3    with the ambiguous and undefined concept of sharing online

 4    gaming information in a synchronized manner by the first and

 5    second viewer client devices.  And then the second term also

 6    includes this ambiguous concept of synchronization, and it

 7    further includes the ambiguous concept of mitigating or

 8    significantly reducing client-by-client latency.

 9        So, Your Honor, because the specification fails to inform

10    a person of ordinary skill of the scope of these terms with

11    reasonable certainty, we submit that these claims are

12    indefinite under the Nautilus standard.

13          THE COURT:  I know that's your position.  Tell me

14    why.

15          MR. BOUTSIKARIS:  So for synchronization, there are

16    -- the specification only provides two different disclosures

17    without any clarity.  So there's two different kinds of

18    synchronization in the specification.  The first is on the

19    left of your screen here.  It shows viewers receiving the same

20    information at around the same time on the different devices

21    on your screen.  The second option in the disclosure is event

22    information that's synchronized with the video.  So those are

23    two different kinds of synchronization that the specification

24    provides.  And a person of ordinary skill, when they're

25    looking at the claim they don't know which one is which.
```

10:58:28 (line 7)

10:59:00 (line 17)

10:59:27 (line 24)

             And if we go back to the claim, it says, "such that the
1

online gaming information is shared in a synchronized manner
2

by the first viewer client device and the second viewer client
3

device."  Looking at that claim language, a person of ordinary
4

skill would not know whether it's option 1 or option 2.
5

             So PANDA argues that it has to be option 1, which is that
6

10:59:59  7  the viewers receive information at around the same time, but

all they point to -- their argument is just injecting a
8

subjective understanding--what is 'around the same time'.
9

There's no way to know based on the specification.  They don't
10

point to anything in the disclosure that says what 'around the
11

same time' is.  All PANDA does is rely on their expert's bare
12

11:00:30  13  assertion that synchronization of digital content is to share

the same information to all viewer client devices at around
14

the same time.  And this type of conclusory, unsupported
15

assertion by an expert is not useful to the Court and
16

shouldn't be given any weight.
17

             So for those two reasons, that's why the first term is
18

indefinite.
19

             This synchronization element that we just talked about is
20

11:00:56  21  also included in the second term, and this term builds on that

with even more indefinite phrases.  So this term also includes
22

"significantly reducing client-by-client latency between two
23

clients to render the event information."
24

             And so in addition to the synchronization aspect which
25

11:01:27    1    renders this term indefinite as well, it also renders it

2    indefinite because the specification provides no objective

3    guidance regarding how to measure client-by-client latency.

4    The specification doesn't tell you what client-by-client

5    latency is, and there's no way to measure it based on looking

6    at what the disclosure is actually providing.

7         And if you were to somehow resolve that dispute of what

8    a -- what client-by-client latency could be, you then have the

11:01:57    9    added issue of what degree of mitigation or reduction of

10    client-by-client latency would satisfy the claims.

11              THE COURT:  Well, let's talk about that for a

12    minute.  The language is "thereby mitigated or significantly

13    reduced."  Obviously 'significantly' is a term of degree, but

14    I'm curious as to your view on 'mitigated or significantly

11:02:28    15    reduced'.  I think your argument would be stronger if the

16    language simply said, 'render the first event information is

17    thereby significantly reduced'.  What's the impact of

18    'mitigated or' here.  And isn't 'mitigated' basically a

19    synonym for 'reduced'?  Could you read this as 'reduced or

20    significantly reduced'?

21              MR. BOUTSIKARIS:  I actually would not read it that

22    way.  'Mitigated' means to make less harmful, and that itself

11:02:58    23    has a built-in -- it's not just a question of reducing

24    mitigation is -- it requires like a relative comparison of

25    making something less harm, and it's different in certain

         1    contexts.  So I don't think it's just -- is it -- has it been

         2    reduced by X amount; it's more of a broader term than that.

         3             THE COURT:  Well, we lawyers all hear about

11:03:28 4    somebody's failure to mitigate their damages, and that really

         5    is a quantitative concept of instead of your damages being a

         6    million dollars, they ought to be $100,000 because you failed

         7    to mitigate.  There's not a lot of subjective calculus there;

         8    it's really more of a hard number type quantitative thing.

         9        I agree that used in different contexts it might have a

11:03:57 10   slightly different meaning, but I'm not sure there's a great

        11    deal of space between 'mitigated' or 'reduced'.  I understand

        12    that the patentee could have said 'reduced or significantly

        13    reduced', and the patentee said 'mitigated or significantly

        14    reduced', but the interchange of these additional words I

        15    think is significant here.

        16        And again, if it were simply the bare 'significantly

        17    reduced' being a term of degree without, as I'm sure you'll

11:04:29 18   argue, much guidance, I think the indefiniteness argument gets

        19    stronger there.

        20        But I really would like to know why you think we're

        21    looking at or what you think the addition of 'mitigated or

        22    significantly reduced' adds to this analysis.

        23             MR. BOUTSIKARIS:  Yeah.  I'll just repeat that.  I

        24    think 'mitigated' is a different term than 'reduced'.  It's a

11:04:56 25   synonym, and 'mitigated' does not -- it depends on the

```
 1    context.  So it's just to make something less harmful.

 2         And the important thing here is in the context of this

 3    patent there is no objective guidance as to what 'mitigated'

 4    actually entails and when you have sufficient mitigation to

 5    fall within the scope of these claims.

 6         So to your point that they use this term, I think

 7    'mitigated or significantly reduced', I think they're just

 8    synonyms for the same concept, which is -- and they are a term

 9    of degree.

10              THE COURT:  All right.

11              MR. BOUTSIKARIS:  So as I was saying earlier, the --

12    this is a -- the claim requires client-by-client latency being

13    mitigated or significantly reduced.  This calls for a

14    measurement, and when a claim requires a measurement, the

15    intrinsic record needs to convey with reasonable certainty the

16    measure that's to be used.  So this is like in the Teva case

17    where there was a claim reciting 'molecular weight', and it

18    was found to be indefinite because the specification only

19    provided three different incompatible measurements to use.

20         And that's precisely the issue that we have in our case

21    here.  There are a bunch of different disclosures, but you

22    don't know which one to use, and they don't apply to the

23    claims here.

24         So the only -- if you look in the specification, the only

25    instance where latency is defined is in the context of a video
```

1    stream.  It says "latency is the delay between a first user

2    generating a live video synchronization and the second user

3    receiving a copy of the live video stream."  This isn't saying

4    anything about event information, latency, or client-by-client

5    latency.  This definition only applies to a completely

6    different context, which is video stream.  There is no

7    objective guidance as to what client-by-client event

8    information latency is.

9        And then these are the rest of the disclosures where

10    latency is being disclosed, and these are all, again, only in

11    the context of video latency.  There is an RTMP latency of 150

12    milliseconds, there's a web RTC latency of 500 milliseconds,

13    there's an HLS latency of 8 seconds, and each one of these,

14    importantly, is only in video.  It is not in event

15    information, and it only involves one individual video stream.

16    It doesn't tell you anything about what the client-by-client

17    event information latency is.

18        So this is not enough of an objective guidance to

19    understand when you have -- to understand how you determine

20    what client-by-client latency measurement you have in a given

21    product.  So since you don't have any way of measuring the

22    client-by-client latency, the term is indefinite.

23        But the next question, even if you were to find a way to

24    measure client-by-client latency, that doesn't even solve the

25    problem because there's this added requirement of mitigation

11:08:23   1    or reduction of client-by-client latency.

2         And as we mentioned earlier, this is a term of degree,

3    and because it's a term of degree, it fails to provide

4    sufficient notice of its scope since it depends on the

5    unpredictable vagaries of any person's opinion.

6         THE COURT:  Try to speak up, if you can, counsel, or

7    get closer to the microphone.

8         MR. BOUTSIKARIS:  Sorry.

11:08:58   9    And then the only example of 'significantly reduced

10   latency' concerns video.  So if you look in the specification,

11   the only point where it says 'significantly reduced', again,

12   is in the context of video; specifically HLS latency.  And it

13   compares a conventional HLS latency on the order of a hundred

14   seconds compared to this disclosed latency of 8 to 12 seconds.

11:09:26   15   So that's the only significantly reduced disclosure in the

16   entire specification.  Notably, again, this does not say

17   anything about event information latency or client-by-client

18   latency.

19        And again, this claim is further indefinite because it is

20   essentially asking you to take a look at a hypothetical device

21   that doesn't exist and see how much your measurement, to the

11:09:57   22   extent you can even find one, how much that latency has

23   decreased from the hypothetical measurement.

24        And for those reasons, we submit that these terms are

25   indefinite.

|       |                                                                                 |
|-------|---------------------------------------------------------------------------------|
|       | 1      THE COURT:  All right.  Let me hear from the                              |
| 11:10:12 | 2   Plaintiff in response, please.                                           |
|       | 3      MR. SARKAR:  Good morning, Your Honor.  This is                           |
|       | 4   Rahul Sarkar with the firm of King & Spalding representing                   |
|       | 5   PANDA.                                                                       |
|       | 6      THE COURT:  Go ahead, counsel.  And I'll ask you to                       |
|       | 7   make sure I can hear you as well.                                            |
|       | 8      MR. SARKAR:  I'm a little shorter.                                        |
| 11:10:59 | 9   THE COURT:  It will pull down.  Pull it down as far                       |
|       | 10  as you need to.                                                              |
|       | 11     MR. SARKAR:  Is that good?                                                |
|       | 12     THE COURT:  That's fine.                                                  |
|       | 13     MR. SARKAR:  So I think Your Honor has it exactly                         |
|       | 14  right.  The claims describe a highly particularized structure                |
|       | 15  for how to achieve the claimed effects of mitigating,                        |
|       | 16  lessening, client-by-client latency.  That structure was                     |
| 11:11:29 | 17  actually described very clearly by counsel for Genius during              |
|       | 18  their discussion of the 'event socket' term.  I believe                      |
|       | 19  counsel for Genius stated that what crystallizes the inventive               |
|       | 20  concept enshrined in the patents is to send a single                         |
|       | 21  synchronized update that has the effects, that achieves the                  |
|       | 22  effects, of mitigating client-by-client latency, or                          |
| 11:11:57 | 23  significantly reducing it.  I think that that is the crux of              |
|       | 24  why these terms are not, in fact, indefinite, whether in view                |
|       | 25  of the intrinsic synchronization, and certainly not in view of               |

1      a person of ordinary skill in the art.

2          With respect to the second part of Defendants' argument

3      that a POSITA would find these terms indefinite, we just have

11:12:24    4   to observe that they have submitted no expert testimony at all

5      regarding how a POSITA would interpret these terms, how a

6      POSITA would construe these terms in light of the

7      specification, or whether these terms have -- even have a

8      standard meaning in the art.

9          Instead, we heard attorney argument repeatedly alleging

10     in a conclusory manner that these terms have no established

11:12:56   11   meaning in the art and that a POSITA would not know how to

12     establish metes and bounds, upper and lower bounds for them.

13     We believe that that's inappropriate.

14         Second, in the IPR petitions that Defendants submitted,

15     neither they nor their expert had any trouble whatsoever

16     knowing what these terms meant, evaluating the prior art in

17     light of what they thought these terms meant, and concluding

11:13:28   18   that the prior art did, in fact, disclose these limitations.

19     They did so for the 'synchronized' term, they did so for the

20     'client-by-client latency' term.

21         Only in the district court and only relying on attorney

22     argument do they now allege that these claims have no

23     established meaning, no discernible meaning, and no objective

11:13:56   24   guidance that a POSITA could obtain from them based on the

25     intrinsic record.  We believe that that kind of inconsistency

1    is, just as with the 'event socket' case, highly

2    inappropriate.

3        Next, Defendants I believe repeatedly stated that there

4    is no disclosure within the specification of any kind of

11:14:28    5    reduction of latency that has to do with event information

6    rather than video.  That is, in fact, simply incorrect.  As

7    you'll see on the left, the '088 Patent discusses a specific

8    quantitative value for the reduction of client-introduced

9    digital content latency.  And in claim 1 of the '088 Patent,

10    it is digital content that corresponds to the first event

11:14:58    11    information was latency is being discussed.  In other words,

12    the specification disclosure on the left clearly establishes

13    explicit quantitative upper and lower bounds for how latency

14    is to be reduced in a manner that's directly mirrored by

15    claim 1 of the '088 Patent.

16        And finally, our -- the expert declaration that we

11:15:29    17    submitted from Dr. Shamos also makes the point that even if

18    such a disclosure didn't exist, latency values for video can

19    be easily adapted to the context of event information, one,

20    after all, video is data and, thus, there is not such a

21    disparity between values that could guide a POSITA to reduce

22    latency for video and values that could guide that same POSITA

11:15:58    23    to reduce latency for event information.

24        And as for what it means to significantly reduce latency

25    in the context of event information, Dr. Shamos has been

1    explicit that it's simply latency that would be perceptible to

2    the end user, and that is all the guidance that is required to

3    enable a POSITA to understand these terms.

4         And with that, that's the end of our argument, unless

11:16:27   5    Your Honor has any other questions.

6              THE COURT:  No, I don't have additional questions at

7    this point.

8         All right.  Let's move on -- do you have something

9    further?

10             MR. BOUTSIKARIS:  Just one in rebuttal.

11             THE COURT:  If you can keep it short.

12             MR. BOUTSIKARIS:  I promise to keep it short.

13        So Your Honor, you mentioned an example of mitigation --

11:16:59  14    mitigating damages like lawyers do.  Mitigating damages from a

15    million dollars to a hundred thousand dollars, that would -- I

16    would consider that mitigating damages.  But what if you

17    mitigated damages and reduced a million dollars of damages to

18    999,000?  I don't think I would consider that mitigated

19    damages.  So this just kind of goes to show that 'mitigation'

20    is context-dependent.

11:17:25  21        And it's also -- another example is you could mitigate

22    latency in -- you know, in one context, such as basketball, a

23    high scoring game of basketball.  That might -- you might need

24    to mitigate latency one extent there, but in a slower moving

25    sport like soccer, if it's a 0-0 game, that would be a

1  different amount of mitigation necessary.

2      So that's all I'll add on the mitigation point.  Thank

3  you for your time.  Thank you.

4          THE COURT:  All right.  Thank you.

11:17:56  5      Okay.  Let's go next to 'persistent connection'.

6      Let me ask this, counsel.  This is a little, I won't say

7  comical, but there seems to be a disagreement about your

8  agreement, or -- there seems to be a disagreement about your

11:18:23  9  agreement.  I can't tell.  It looks like somebody suggested

10  one thing and the other side agreed with it and then said now

11  it's agreed to, and the other side said, We never agreed; we

12  just suggested it.  Where are we on this?

13      Do you have a dispute here, Mr. Wood?

14          MR. WOOD:  Do we have the slides up?

15      Let me real quick just make sure I know which clicker it

16  is.

17      I believe we do, Your Honor.  We were not informed that

11:18:57  18  the parties had an agreement before Defendants submitted their

19  responsive brief indicating the parties had an agreement.  We

20  don't believe the addition of this bolded language that has

21  been added to this, quote unquote, agreed construction is

22  necessary.  We believe the plain and ordinary meaning is the

23  plain and ordinary meaning, and, frankly, I have no idea what

24  Defendants think is being added, subtracted, or changed from

11:19:27  25  the plain and ordinary meaning by adding this language because

1  this is the sum total of the argument on this term that was

2  included in their brief.

3      So I think those questions may be about whether there's

4  an agreement or what is being proposed in this, quote unquote,

5  agreed proposal may be better addressed to Defense counsel.

6  And if the Court will permit me, I'll reserve the majority of

7  our time for rebuttal once I've heard argument on this term.

8          THE COURT:  Well, let me just ask this before you

9  sit down.

10          MR. WOOD:  Yes, sir.

11          THE COURT:  Both sides seem to be in the same

11:20:00  12  posture that the plain and ordinary meaning should apply.  I

13  gather from what you've said there may be below that a dispute

14  about what is the plain and ordinary meaning?

15          MR. WOOD:  It's possible, Your Honor.  I'm not sure

16  what is being added by this language or why the Defendants

17  believe it's necessary to include this explanation after just

18  saying plain and ordinary meaning.  And Your Honor has already

11:20:27  19  pointed out earlier this morning the concern about potential

20  claim construction disputes that may pop up later in the case

21  after claim construction.  We don't want to have an *02 Micro*

22  dispute here.

23      If there was -- if there had been any argument in

24  Defendants' briefing about why they believe this language is

25  important or necessary to add, we could have joined issue on

                    1    that point; but we haven't heard anything, so it's difficult

                    2    for me to respond to that right now.

11:20:58            3            THE COURT:  All right.  Well, let me ask Defendants

                    4    to give me their argument, and then we'll see where we are.

                    5            MR. WILLIAMSON:  Good morning, Your Honor.  Nick

                    6    Williamson from Bryan Cave Leighton Paisner for the Sportrader

                    7    Defendants and speaking on behalf of all Defendants this

                    8    morning.

                    9            THE COURT:  Good morning.  Please go ahead.

                   10            MR. WILLIAMSON:  I'm not sure I would have used the

                   11    word comical, but a simple dispute here I think is accurate.

                   12            THE COURT:  You got to look for humor where you can

11:21:30           13    find it.

                   14            MR. WILLIAMSON:  Absolutely, Your Honor.

                   15        And I want to clear up one thing at the start because

                   16    there's been some going back and forth as to whether

                   17    Defendants represented that there is an agreed construction

                   18    here, and Defendants simply in their responsive brief

                   19    presented this as a proposed agreed construction.  So we

                   20    weren't trying to put words into anyone's mouth, but what we

                   21    did do was take words from the Plaintiffs' opening brief where

11:21:55           22    they said, Here's an exemplary definition from the *Microsoft*

                   23    *Computing Dictionary*, and then said that the patents use this

                   24    general understanding consistent with the dictionary

                   25    definition.

1    And the reason why we took that language and put it in

2    with plain and ordinary meaning in the form that we did with

3    our proposed construction is, Your Honor, to provide some

4    metes and bounds so that we don't have a battle of the experts

5    as to as to what plain and ordinary meaning is down the road.

6    We have prior art references that have different types of

7    connections, and we have accused products that have different

8    types of connections, and we're looking for some sort of

9    boundaries on a navigable channel that maybe it's not going to

10   get rid of all the disputes down the road, but it's certainly

11   going to help to focus the issues.

12   And so we propose that the plain and ordinary meaning

13   should be interpreted as 'a connection to a client that

14   remains open after a response', and we don't see a whole lot

15   of daylight between that and what we had originally proposed

16   as a construction for this term.

17           THE COURT:  All right.  So whether it's what you

18   originally proposed or not, in effect substantively what

19   you're telling me is it's your position that 'persistent

20   connection' should be construed as 'a connection to a client

21   that remains open after a server sends a response'.  Is that

22   accurate?

23           MR. WILLIAMSON:  That is, Your Honor.

24           THE COURT:  Okay.  Give me your best argument as to

25   why that should be the Court's construction here.

11:22:28 (line 8)
11:22:57 (line 18)

         1           MR. WILLIAMSON:  That should be the Court's

         2    construction because it is consistent with the specification.

11:23:25 3    If you look to -- this is the '697 Patent, column 41, lines 10

         4    to 16.  The patent discusses a connection for a livestream

         5    content distribution, and that connection is described as

         6    being a persistent connection.  And in our read of that, Your

         7    Honor, what a persistent connection requires for a livestream

         8    is that it be continuous and uninterrupted, or that it remain

11:23:59 9    open after a response is received because there's a livestream

        10    coming through it.  And if the connection is not either

        11    continuous and uninterrupted or doesn't remain open, that

        12    livestream is not a stream nor is it live.

        13           And so from reading the specification with the best

        14    understanding that we can, that's how we got to either of

        15    those two things would be appropriate for this term.

11:24:43 16           And Your Honor, I'll layer onto that that we're also

        17    adopting language that the Plaintiff used as to what the term

        18    means, and we adopted what their position was so -- in terms

11:24:57 19    of what the *Microsoft Computing Dictionary* says and the

        20    general understanding of the patents in view of that.

        21           THE COURT:  All right.  Do you have anything else

        22    for me here?

        23           MR. WILLIAMSON:  I do not, Your Honor.

        24           THE COURT:  Okay.  All right, Mr. Wood, I'll give

        25    Plaintiff some additional time.  I don't know that I've ever

1    seen a lawyer offer a blank slide as persuasive.

11:25:28    2         MR. WOOD:  I've never in a position where it seemed

3    appropriate to offer a blank slide as persuasive, but I've

4    also never had to come up and argue a term without any

5    briefing from the other side on it.

6         THE COURT:  Let's just begin with the assumption

7    that what Defendants are proposing is 'connection to a client

8    that remains open after a server sends a response'.  Tell me

9    what's wrong with that, and then tell me what it should be.

10         MR. WOOD:  I think what's wrong with it is there's

11    no need to construe it because a person of ordinary skill in

11:25:57    12    the art would understand what a persistent connection is, and

13    there's no need to construe that.

14      Mr. Williamson talked about a potential battle of the

15    experts and the experts disagreeing about whether a certain

16    component, a certain type of connection meets that plain and

17    ordinary definition of 'persist connection' or not.  That to

18    me sounds exactly what jury trials become all the time.

19      If the Court construes this language, first, I would say

11:26:28    20    we -- this is the first time we have seen this as a disputed

21    construction that they're asking the Court to adopt wholesale.

22    It's the first time we're hearing argument on it.  So if the

23    Court's inclined to consider that, at a minimum we'd ask for

24    an opportunity to have some sort of supplemental briefing or

25    something so I'm not -- we're not having to respond within

1    seconds to this argument for the first time.

2        But if the Court is going to construe this language, I

3    don't know what 'open' means, how long it has to stay open.

11:26:57    4    We had this same sort of issue that Mr. Davis flagged with

5    respect to a particular event, what happens when the event is

6    over, how long does this have to stay open, is it for a

7    second, is it for an hour, is it forever.  If the Court goes

8    to the plain and ordinary meaning, the experts can sit here

9    and explain to the jury what they think that meaning is and

10    whether they think a piece of prior art or accused product

11    meets that plain and ordinary meaning or not.

11:27:29    12        THE COURT:  Can you assure me if I adopt plain and

13    ordinary meaning that I won't be confronted with somebody

14    demanding additional claim construction somewhere down the

15    road when it's the least convenient for the Court or the

16    parties?

17        MR. WOOD:  I don't know how a party could do that.

18    I can represent that I don't see how PANDA would possibly come

19    and make that argument.  But if the Court adopts this proposed

20    construction, I think that there's a high degree of likelihood

11:27:57    21    that at a summary judgment motion you -- we're going to have

22    argument about what this construction actually means because

23    we haven't had the opportunity to brief that or join issue on

24    that here.

25        The other point I would make Your Honor --

1      If we can go to slide 25.

2      The Defendants have pointed to this definition they say

3 was taken from our brief.  They, of course, could have spent

11:28:29   4 time in their brief explaining why they think this is an

5 appropriate definition, but all I would say is we clearly

6 stated this was an exemplary definition.  We weren't intending

7 it to be limiting.  There is no argument or indication that

8 the patentee intended to adopt this definition or disavow

9 anything that might be included in this definition.  We used

10 it as an example to show why a person of ordinary skill in the

11 art would have no problem understanding what a persistent

12 connection is, but we don't believe there's anything to

11:28:57  13 indicate the patentee intended to adopt this definition in the

14 patent to the exclusion of anything else.

15      THE COURT:  Well, let's just be real clear about

16 something.  Are you specifically asking the Court to provide

17 you an opportunity for some additional briefing, or are you

18 not asking me for that?

19      MR. WOOD:  I'm asking the Court to adopt the plain

20 and ordinary meaning of the term.

21      THE COURT:  That wasn't my question.  Are you asking

22 me to allow additional briefing by the Plaintiff on this term,

23 or are you not asking me to allow additional briefing by the

24 Plaintiff on this term?

11:29:28  25      MR. WOOD:  I think we'll stand on our current

1    briefing, Your Honor.

2         THE COURT:  All right.  Thank you.

3         Let's go to 'online gaming information' next.

4         And this is very close to what we just went through.

5    What's different about this than what we just talked about

6    with 'persistent connection'?

7         MR. WILLIAMSON:  Well, Your Honor, it's a great

11:30:00    8    question.

9         Nick Williamson again, for the record.

10        I think that a distinguishing point, if I can respond

11   very briefly on 'persistent connection' that is a difference

12   between that term and this term in terms of the nature of the

13   dispute that's before the Court, is that in Plaintiff's

14   briefing for 'persistent connection' after offering the

15   Microsoft dictionary definition--and this is ECF 149 at ECF

11:30:27    16   page No. 19--the Plaintiffs stated that the patents use the

17   term 'persistent connection' consistent with this general

18   understanding, referring back to the dictionary.

19        So to the extent that maybe there's not lexicography

20   within the patent itself that defines 'persistent connection',

21   there is in Plaintiffs' briefing a representation tying that

22   definition that we have agreed to to the claim term.

11:30:57    23        For 'online gaming information', their briefing presented

24   a little bit different approach and used an e.g., a for

25   example.  And we had originally proposed, just for

1    perspective, 'information about a video game played over the

2    internet for online gaming information'.  And that's based on

3    the specification, which at column 7, lines 65 to 66 of the

4    '697 Patent, uses 'online gaming' only one time, and it's in a

11:31:28    5    parenthetical describing gaming-related activities and also

6    referencing chess matches and roll-playing games and board

7    games.  And based on our reasonable read of that, we had made

8    our proposed construction.

9        The Plaintiffs' opening brief came out and offered an

10    exemplary rephrasing of the meaning of the term of

11    'information used for or relevant to gaming conducted over the

12    internet'.  And there's a lot of shared words between our

11:31:58    13    proposal and theirs--'information', 'gaming', and 'over the

14    internet'.

15        And like the other term, Your Honor, 'persistent

16    connection', we didn't see a whole lot of daylight between the

17    exemplary definition that they had provided and what we were

18    originally proposing, and so we had adopted that as our

19    proposed agreed construction.

20        The reason, Your Honor--or a reason; excuse me--that we

21    had gone down this route to try to put some boundaries on what

22    the meaning of 'online gaming information' is, is that in all

11:32:29    23    of the seven claims, six claims in the '218 Patent and one

24    claim in the '088 Patent that are asserted and use this term,

25    each and every claim requires that this online gaming

11:32:56

11:33:26

11:33:57

1    information be germane to a sporting event, relate to a

2    sporting event, or relate to a sporting or gaming event.  And

3    we believe that it's appropriate to put some boundaries on the

4    meaning of this claim, define what the plain and ordinary

5    meaning is to assist the fact finder in drawing that

6    association that the claims require; and that without some

7    sort of boundaries on the meaning of the claim, that that's

8    going to be more difficult than it needs to at the end of the

9    day.

10          I'd also like to respond to one thing that the Plaintiffs

11    have raised in additional briefing on the motion to strike,

12    Your Honor, that you ruled on yesterday, and they had

13    referenced -- excuse me.  This was in their opening brief.  I

14    apologize.  This was their opening brief, ECF 149.  They had

15    referenced a supposedly inconsistent position that Defendants

16    had taken in the IPR proceedings and cited to Exhibit 19 to

17    their opening brief at pages 56 to 57 as showing that.  We

18    looked at those pages of Exhibit 19, we looked through all of

19    Exhibit 19, there's no reference to 'online gaming

20    information' in that exhibit, so I don't know what their

21    argument is or what they're trying to say, but what they have

22    cited to doesn't support whatever their argument is about the

23    IPR proceedings.

24          THE COURT:  All right.  Anything else,

25    Mr. Williamson?

1          MR. WILLIAMSON:  No, Your Honor.  Thank you.

2          THE COURT:  Mr. Wood, do you want to take a position

3     on this?

4          MR. WOOD:  Yes, Your Honor.

5       So slide 27.

6       So Your Honor, we're going to be in the exact same boat

7     as I'm worried about with respect to 'persistent connection'.

8     If I recall correctly, Defendants' original proposed term --

9     construction for this term was limited and related to 'video

10    games'.  When they say they're adopting our definition, which

11    was intended to be exemplary, it has an e.g. in front of it,

12    they don't see a lot of daylight there, that worries me

13    because I don't know whether this is still limited to 'video

14    games' in their eyes; whether 'gaming', which is a very

15    commonly used euphemism for online gambling is included in

16    their proposed definition, and I'm worried that we're going to

17    have a very similar fight at summary judgment as we would have

18    with 'persistent connection' as we would here over what

19    'gaming' means if the Court adopts this construction.

20       As -- if we get slide 32.

21          THE COURT:  Well, their proposed construction, as I

22    read it, doesn't address the meaning of 'gaming' at all; it

23    just uses it again.

24          MR. WOOD:  I agree with you, Your Honor.  I don't --

25    I don't see what this adds --

1          THE COURT:  Are you suggesting that the Court should

2     construe the word 'gaming'?

3          MR. WOOD:  No, Your Honor.  I believe it has a plain

4     and ordinary, well-understood meaning.  I think the fact that

5     it -- that their construction doesn't even try to define what

6     'gaming' is just shows even more that it's not an appropriate

7     construction because the only other two words in that -- in

11:36:01  8     the term that's being submitted to be construed are

9     'online'--the word 'internet' appears in their construction;

10     that's not being construed--and the word 'information'.

11     'Information' appears in their construction as well and isn't

12     being construed.

13          I think all three of those terms are going to be easy to

14     understand for the jury, have a well-understood plain and

15     ordinary meaning to a POSITA, and to the extent any of them

16     didn't, this proposed construction doesn't do anything to

11:36:29  17     illuminate what these terms mean.  So we believe the plain and

18     ordinary meaning is appropriate here.

19          THE COURT:  All right.  Thank you.

20          All right.  Let's go on to the next -- do you have --

21          MR. WILLIAMSON:  Do you want to hear anything more?

22          THE COURT:  I'm willing to hear something more.  I

23     don't necessarily want to hear something more.  Do you have

24     something that you think I need to hear on this?

25          MR. WILLIAMSON:  I wanted to briefly, Your Honor,

11:36:59    1    respond to your question of whether you needed to define

2    'gaming' later on.

3            THE COURT:  Well, let me ask you this --

4            MR. WILLIAMSON:  Yes.

5            THE COURT:  -- question since you're at the podium,

6    Mr. Williamson.

7        The language here from the claim is 'online gaming

8    information'.  Tell me why what you're proposing is really

9    just not a reordering of the same words--'information used for

10   and relevant to gaming conducted on the internet'.  I guess

11   'online' means 'conducted on the internet', which is no great

11:37:30   12   leap, but how helpful is it to basically rearrange the

13   language that's being construed as -- or with regard to

14   offering a construction that's supposed to inform the Court

15   and the jury to a degree beyond the language itself?

16       Often just rearranging the words as a construction is a

11:37:58   17   really abdication of the claim construction obligation, I

18   think, unless there's a reason why the order makes significant

19   sense.

20       Tell me why what you've given me here isn't really just a

21   rearranging of the same words that need to be construed, and

22   if it is, why is that something that should be compelling?

23           MR. WILLIAMSON:  Thank you, Your Honor.  And it's a

24   very good point.

25       We don't read it as a rearranging of the terms.  We read

11:38:26  1    it as an affirmation of the specification, which defines

2    'online gaming' in the context of game-related information

3    with things like chess matches, roll playing games and board

4    games.

5        And so when we look -- and this is where I was initially

6    going to go of do we need to define 'gaming', perhaps the

7    answer is yes, because we look at the specification the

8    teachings of the patents and we look at -- we understand that

9    term 'gaming' to refer to games, whether they be board games,

11:38:57  10   whether they be video games, and not to what Plaintiffs'

11   counsel has now referred to as gambling.  And so that's --

12   that is a very good point I think that your read of the games

13   being conducted over the internet--excuse me--that -- the

14   language that we adopted from Plaintiffs, so the 'games being

15   conducted over the internet' is different than 'online gaming

11:39:26  16   information', and that it requires that the game be conducted

17   or played or held over the internet and is not just simply

18   information that relates to something that occurs online.  And

19   I think that's another differentiating point that's worth

20   highlighting.

21              THE COURT:  All right.  Thank you.

22              MR. WILLIAMSON:  Thank you.

23              THE COURT:  All right.  Let's go on.

11:39:59  24       Next up is language from the '088 Patent, 'the at least

25   one first display of the first client device'.

11:40:27

11:40:59

11:41:29

1    Defendants say it's indefinite; Plaintiffs seem to say

2    that there is an error here that should be appropriately

3    corrected.  My reading of the briefing is that nobody really

4    says this isn't an error; it's a matter of what do you do with

5    it.  Plaintiffs say it's obvious and should be corrected, and

6    Defendants say it makes everything indefinite and it should be

7    struck.

8        So let me hear from the Defendants first.

9        MR. BRELL:  Thank you, Your Honor.  George Brell

10   from Bryan Cave Leighton & Paisner on behalf of the

11   Defendants.

12       I'm hopeful this will be a brief argument.  And what I'll

13   say is the standard here is that the correction, if there is

14   to be one--and as you said, it appears to be acknowledge that

15   it's an error--that a correction can't be subject to

16   reasonable debate.  And I think the argument from Defendants

17   is that it's not clear from the face of the patent that there

18   isn't -- there is a clear one way to go here because --

19       THE COURT:  I mean, isn't this whether it should be

20   the word 'first' or the word 'second'?

21       MR. BRELL:  Yes, Your Honor.  And --

22       THE COURT:  And how subject to debate is that?

23       MR. BRELL:  So Your Honor, it's not an issue where

24   they've identified something that's not in the patent; the

25   problem is there was already a first client device claimed in

1    the patent.  And while it is unusual perhaps if the first

2    display referenced here is on that first client device as

3    opposed to PANDA's preferred second client device, it's not

4    unworkable.

5        And, furthermore, the claim itself references a first

6    display of a second client device separately, which I would

7    say if you were reading it and you see that they correctly

11:41:58    8    reference it in one place, you should believe that they have

9    correctly referenced this other display in the second place.

10        THE COURT:  Doesn't the correct referencing of it

11    elsewhere using 'second client device' instead of 'first

12    client device' just confirm that the use of it as 'first

13    client device' is probably an error that needs to be 'second'?

14    I mean, instead of saying it confirms that we don't know which

15    one, isn't it really just the opposite--that it confirms what

11:42:29    16    the correction should be?

17        MR. BRELL:  I think there is reasonable debate as to

18    whether this other reference is confirmatory or antagonistic

19    to their argument.  I think that's the standard here.

20        I'd also point out that in the cases discussing this

21    issue, there is a factor of whether the patentee has moved to

22    correct this issue, and as far as I'm aware they haven't.

23    They're asking the Court to do so.

24        THE COURT:  All right.  Anything else?

25        MR. BRELL:  No, Your Honor.  Thank you.

11:42:53    1        THE COURT:  All right.  Let me hear from Plaintiff.

2        MR. LAFFERTY:  So thank you, Your Honor.  Patrick

3    Lafferty from King & Spalding.  I'll argue this term for the

4    Plaintiffs.

5        THE COURT:  Please proceed.

6        MR. LAFFERTY:  Thank you very much.

7    So this is the first we heard that they -- that

8    Defendants may be arguing that it's not a typographical error,

9    but in the briefing they identify it and recognize that it is,

10   in fact, a typographical error.  I don't think there's really

11   reasonable debate on there.

12   There's no debate that the Court has the ability to

11:43:27   13   correct a typographical error if it's obvious or evident from

14   the face of the patent, and that it's not subject to

15   reasonable debate.

16   So the question is here is it obvious and evident from

17   the face of the patent, and the answer here is yes.  I think

18   Your Honor hit on some of the key issues.

19   So this is claim 24.  I've underlined the term at issue,

20   'first client device'.  The first thing to note is there's

21   only two client devices here, a first client device and a

11:43:57   22   second client device.  Based on their prior briefing that this

23   is a typographical error, if it's not the first client device

24   there's only one other option and it's the second client

25   device.

|            |    |
|------------|----|
|            | 1  | Now, the claim can be divided up in half, as I've done |
|            | 2  | here.  The left side relates to what the first client device |
|            | 3  | is doing in the claim; the right side is what the second |
|            | 4  | client device is doing.  So if we look at what the first |
|            | 5  | client device is doing, it's generating or providing a |
| 11:44:28   | 6  | composite outgoing stream.  So it receives audio and video |
|            | 7  | feed, generates something else.  What happens with that |
|            | 8  | composite outgoing feed or stream, the second client device |
|            | 9  | receives it and renders it.  Where does it render it?  On the |
|            | 10 | first display. |

And that's exactly what the claim says.  It wouldn't make sense for the first client device to provide the composite outgoing stream and then receive it and then render it again. So it's pretty obvious from the way this claim is structured that it's the second device that receives and renders it.

11:45:00  The other thing about the claim is it talks about -- at least the part regarding the second client device, it talks about instructions that cause the second client device to do something.  And that's where this language comes from.  It's to cause the second client device to receive and render that stream that's coming from the first client device, or at least was generated by it.

11:45:27  So that tells us it is the second client device that the relevant language is related to, and that's where it's rendered.  That's -- the instructions cause the second device

1    to do that.  So we can see from the way this is structured

2    with instructions that this should be the second client

3    device.

4        And I think this is what Your Honor hinted at earlier.

5    I think this is right on point.  Right?  The web server

6    transmits the instructions to a second client device that

7    includes at least one first display.  That's the only

8    reference to a first display.  Throughout the rest of the

9    claim, it's the first display.  And that's where it appears

11:45:57   10   down here right before the language at issue.  A person of

11   ordinary skill in the art reading this would recognize that

12   when it's referring to the first display, it's talking about

13   the first display of the second client device; the only device

14   that was identified as having a first display.

15       Now, we also see the 'render' language again.  And this

16   is relevant too, Your Honor.  Even this part on the right of

17   the claim is sort of split into two parts.  The first part is

18   sort of a higher level about how the instructions are going to

19   be used by the second client device; the bottom part is a

20   little bit more detail.

11:46:29   21       And so the first part says that the second client device

22   is going to render that first video.  How does it do that?

23   Well, it gets these instructions that cause it to do each one

24   of these things--receive and render, and the rendering is on

25   the first display.  That should be the second client device.

|       |                                                                                  |
|-------|----------------------------------------------------------------------------------|
|     1 | That's how the claim lines up.                                                    |
|     2 | You don't have to take my word for it, Your Honor.  It's                          |
|     3 | in their IPR petitions.  Right?  Here it is, Exhibit 18, pages                     |
| 11:46:57   4 | 52 to 53.  They're talking about limitation in claim 24 of the             |
|     5 | patent.  I've underlined the term.  It's the exact term, 'the                     |
|     6 | at least one first display of the first client device'.                           |
|     7 | They're talking about it.                                                         |
|     8 | And then they recognize exactly what Your Honor pointed                            |
|     9 | out:  "The only previously discussed display in claim 24 is                        |
|    10 | located on the second client device."                                            |
|    11 | So what do they do?  Do they say it's indefinite, they                             |
|    12 | have no idea what it is, it could be the first client device?                      |
|    13 | No.  They say, "For purposes of this petition, the display                         |
| 11:47:28  14 | referred to in limitation 24.8 is understood to be located on               |
|    15 | the second client device."  It's the exact correction that                        |
|    16 | we're seeking here; exactly what they did in the IPR.  They                        |
|    17 | had no problem doing that there; shouldn't have a problem                          |
|    18 | doing it here.                                                                    |
|    19 | And then my colleagues suggested that this correction                              |
|    20 | doesn't meet the requirements because it's not evident and                         |
|    21 | it's subject to reasonable debate.  Haven't heard why yet.                         |
| 11:47:58  22 | Today was I guess the closest they got to it, but they still                 |
|    23 | haven't made an argument.  Instead, they lumped three terms                        |
|    24 | 38, 39, and 40 that are unrelated and just recited or restated                     |
|    25 | the standard.  There's no argument here.  There's no showing                       |

1   that it's subject to reasonable debate and what that debate

2   would be.  Structure of the claim I think is straightforward,

3   and this is exactly the type of typographical error that

4   should be corrected a 'first' to a 'second'.

5           THE COURT:  All right.  Thank you, counsel.

6           MR. LAFFERTY:  Thank you.

11:48:28   7           THE COURT:  Let's go onto the next term, which is

8   really the same song second verse what we've just been

9   through.  This is also from the '088 Patent:  'wherein the

10   second instructions transmitted by the web server cause the

11   third client device to connect to the second media server

12   endpoint', et cetera.

11:48:55  13      Here we're back to what's apparently recognized as an

14   error, and the issue is whether that error causes the language

15   in the term -- in the claim to be indefinite, or whether it

16   can be and should be corrected because it's not subject to

17   reasonable debate.

18      What's new about this that we haven't already heard?

19         MR. BRELL:  Pretty much nothing, Your Honor, and

20   I'll save the Court time by not pontificating.

21      I was only going to point out that opposing counsel

22   suggested that terms 38 through 40 were totally different.

11:49:29  23  Claims 38 and 39 -- or terms 38 and 39 were exactly the same

24   term and one dropped out because they withdrew that claim.

25   Otherwise, I'll sit down.

1          THE COURT:  Well, before you do that let me ask you

2      one question, and that is, I think the test here, as everybody

3      seems to recognize, is whether or not the correction or the

4      proposed correction is subject to reasonable debate.  I think

5      with capable lawyers like we have here, anything is subject to

6      debate.  The question is is that debate reasonable.

11:49:56    7      What, in your mind, would make a dispute about whether

8      this should be corrected as proposed reasonably uncertain or

9      subject to a reasonable debate?

10          MR. BRELL:  I think that in both instances, Your

11      Honor, the fact that the allegedly mistaken reference is

12      referencing another specifically-claimed item.  It's not

13      simply that it lacks anticipant basis, but that it's referring

14      to something that's already claimed creates reasonable debate.

15          THE COURT:  All right.  Thank you.

16          MR. BRELL:  Thank you, Your Honor.

11:50:29   17          THE COURT:  What's Plaintiff have to add on this

18      term?

19          MR. LAFFERTY:  Thank you, Your Honor.  Patrick

20      Lafferty again.  I'll argue this term.  I'll keep it very

21      brief.

22      I just want to point out that it's not just that it's

23      referencing something else in the claim; you have to look at

24      the context of the claim as a whole.

25      Here's the claim at issue, claim 31.  We've got a third

11:50:59

1    client device, we have a web server that causes that third

2    client device to connect to the second media server endpoint

3    to receive over this communication channel that's established

4    by that connection between the third client device and then it

5    says the 'first media server endpoint'.

6        It's clear -- it's in the very preceding line it's the

7    second media server endpoint.  It's about as clear as it can

8    get that it, you know, is a typographical error and should say

9    second.  That's the context of the claim, and that's what we

10   have to look at it.  It's not the fact that, yeah, earlier

11   they recited a first media server endpoint; we have to look at

12   the actual use in the claim.

11:51:29

13       And I just want to highlight for Your Honor that, again,

14   the Defendants had no problem in the IPRs understanding that

15   this was a typographical error.  This is Exhibit 18, page 55.

16   Again, they're talking about the exact same language

17   here--'the first media server endpoint'.  And what do they

18   say?  They say, "For purposes of this petition, a POSA would

19   have understood that the third client device connects to the

11:51:56

20   second media server endpoint, not the first."  They knew

21   exactly what was going on here in the IPR.  No reason that

22   those things should change, other than they're trying to

23   invalidate this patent in two different forums using different

24   arguments.

25             THE COURT:  All right.

```
 1              MR. LAFFERTY:  Thank you, Your Honor.

 2              MR. BRELL:  Your Honor, can I say one thing very

 3     quickly?

 4         As Your Honor is aware --

 5              THE COURT:  Yes, you can say one thing very quickly.

 6              MR. BRELL:  Defendants are not able to raise

 7     indefiniteness in the IPR, and so attempted to give it the

 8     best meaning we could.

 9              THE COURT:  So noted.

10         All right, counsel.  That brings us to the end of what I

11     have scheduled for oral argument today.  Is either side aware

12     of anything that should otherwise be subject to oral argument

13     that hasn't been covered or reached?

14              MR. WOOD:  Nothing from Plaintiff, Your Honor.

15              MR. WILLIAMSON:  No, Your Honor.  Thank you.

16              THE COURT:  All right.  Well, these issues and any

17     remaining issues are under submission.  I'll try to get you

18     guidance by way of a written opinion as soon as practical.

19         That completes claim construction before the Court today.

20     I thank you for your presence and your able argument.  You're

21     excused.

22         And the Court stands in recess.

23                       (End of hearing.)

24

25
```

11:52:29  (line 11)
11:52:57  (line 19)
11:53:05  (line 22)

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              05/15/2025

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25